Michael MANLEY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 33, 1997, 54, 1997.

Supreme Court of Delaware.

Submitted: Feb. 24, 1998.
Decided: April 14, 1998.

Thomas A. Foley (argued), Wilmington, and Anthony A. Figliola, Jr. (argued), Wilmington, for appellant.

Timothy J. Donovan, Jr., William E. Molchen (argued), and Thomas E. Brown, Deputy Attorneys' General, Wilmington, for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ. (constituting the Court en Banc).

HOLLAND, Justice:

This is an appeal after a capital murder trial and penalty hearing where the defendant-appellant, Michael Manley ("Manley"), was sentenced to death. On November 13, 1995, Manley and his co-defendant, David Stevenson ("Stevenson"), were arrested and charged with the murder of Kristopher Heath ("Heath"). Heath's death had occurred earlier that day. After a joint trial in the Superior Court, a jury found both Manley and Stevenson guilty of Murder in the First Degree and related offenses.[1] The State then sought the death penalty for both defendants.

At the penalty phase of their joint trial, seven members of the jury voted to recommend the death penalty for Manley and five members voted against that recommendation.[2] By a vote of eight to four, the same

---

1. On December 18, 1995, the Grand Jury returned a six-count indictment: Murder in the First Degree, Conspiracy in the First Degree, Aggravated Act of Intimidation, Conspiracy in the Second Degree and two counts of Possession of a Firearm During the commission of a Felony. Each defendant was found guilty on all six counts.

Count I of the indictment, which charged Murder in the First Degree, alleged that "Michael Manley and David Stevenson, on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, did intentionally cause the death of Kristopher Heath, by shooting him with a handgun."

A person who intentionally causes the death of another person is guilty of Murder in the First Degree in violation of 11 *Del. C.* § 636(a)(1).

2. More precisely, the jurors answered two questions, as required by Section 4209: first, whether at least one statutory aggravating circumstance existed beyond a reasonable doubt; and, second, whether, after weighing all the aggravating and mitigating evidence, the aggravating circumstances outweighed the mitigating circumstances

jurors also recommended that Stevenson receive a death sentence. The Superior Court sentenced both Manley and Stevenson to death by lethal injection.[3] An automatic appeal of each death sentence was docketed with this Court pursuant to 11 *Del. C.* § 4209(g) and Supreme Court Rule 35.

In this Court, Manley's automatic appeal was consolidated with Manley's separately filed direct appeal. Manley has raised five contentions in this Court. First, he argues that the Superior Court erred in denying his request for more open-ended *voir dire* regarding prospective jurors' viewpoints about the death penalty. Second, he argues the Superior Court erred by removing two jurors for cause, who were determined not to be "death qualified" and by refusing to remove three jurors for cause, who Manley alleges were not "life qualified." Third, he argues that the Superior Court abused its discretion by failing to grant his motion for severance. Manley argues that he was prejudiced because his defense and that of his co-defendant, Stevenson, were mutually antagonistic. Fourth, Manley argues the Superior Court violated his Fifth Amendment right of confrontation by permitting the State to introduce into evidence a statement by Stevenson, who did not testify at trial. Fifth, Manley argues that the imposition of his death sentence was disproportionate to the penalty imposed in similar cases.

This Court has carefully considered each of Manley's contentions. We have also reviewed his sentence of death, as required by the Delaware Death Penalty Statute. We have determined that the arguments raised by Manley, challenging the judgments entered after both the guilt and the penalty phases of his trial, are without merit. We have also concluded that the Superior Court's decision to sentence Manley to death by lethal injection should be affirmed.

## FACTS

The defendants' joint trial commenced on October 30, 1996, and concluded on November 12, 1996. The facts, as set forth in this opinion, are taken primarily from the findings in the Superior Court's written decision following the guilt phase of Manley's trial and the subsequent penalty hearing. *See State v. Manley,* Del.Super., No. 9511007022, Barron, J., 1997 WL 27094 (Jan. 10, 1997) (Findings After Penalty Hearing). Before announcing its sentences, the Superior Court determined that to put this case into a proper perspective, it had to begin with a recitation of the events that had occurred during September 1994, more than a year prior to the murder of Heath. This opinion also begins with those 1994 actions.

### Macy's Thefts

On September 30, 1994, Stevenson was arrested by Detective Thomas Ford of the Delaware State Police in connection with the fraudulent use of credit cards to purchase Macy's gift certificates.[4] Stevenson had been employed by Macy's and worked in the ladies shoe department when these purchases were made. In making the arrest, Detective Ford relied upon information supplied to him by, among others, Parminder Chona ("Chona") and Heath, who were both employed by Macy's as security officers. Their investigation of the Macy's internal theft culminated in Stevenson confessing to the thefts.

In February 1995, Stevenson was indicted on nine counts of felony Theft and nine counts of felony Unlawful Use of a Credit Card. Four of the thefts occurred on Septem-

---

by a preponderance of the evidence. 11 *Del. C.* § 4209(c). In Manley's case, the jurors answered the first interrogatory in the affirmative by a unanimous vote, with regard to the existence of four separate statutory aggravating circumstances. Those same jurors responded to the second interrogatory with seven affirmative votes and five negative votes.

3. The Delaware Death Penalty Statute directs the Superior Court judge to consider the "recommendation of the jury," and conduct his or her independent determination before deciding the appropriate sentence. 11 *Del. C.* § 4209(d).

4. At the murder trial, which is the subject matter of this appeal, the Superior Court ruled that the Macy's theft evidence was admissible to show identity and motive, pursuant to D.R.E. 404(b) and 403. *See Getz v. State,* Del.Supr., 538 A.2d 726 (1988). A limiting instruction was included in the Superior Court's final instructions to the jury.

ber 2, 1994; five of the thefts occurred on September 15, 1994. Each theft was in the amount of $500, for a total of $4,500.

On April 1, 1995, Stevenson's attorney filed with the Superior Court a Motion to Suppress. This motion sought to suppress all statements which Stevenson had given to agents of Macy's department store on September 30, 1994. Stevenson's attorney argued that his statement was not given voluntarily. The Superior Court held a suppression hearing on August 23, 1995. The presentation of the evidence included testimony from Chona and Heath. The Superior Court concluded that Stevenson's September 30, 1994 statement to the Macy's security personnel was voluntary. Accordingly, the Motion to Suppress was denied.

The theft case against Stevenson was originally set for trial on April 12, 1995. After four continuances, the trial was rescheduled for November 13, 1995. Two of the witnesses subpoenaed to testify on November 13, 1995, were Chona and Heath.

### The Murder

The Superior Court concluded the credible evidence established that Stevenson and Manley left Stevenson's Wilmington residence on November 13, 1995, at approximately 6:45 a.m.[5] They were in a vehicle, jointly owned by Stevenson and his sister. That vehicle was distinctive in appearance because its dark blue paint had peeled off in many places, leaving silvery splotches in all such locations. A gold and red tassel hung from the rearview mirror. The vehicle was a 1989 Mercury Topaz with Delaware license number 727970.

At approximately 7 a.m., Michael Chandler ("Chandler") was leaving for work when he observed the "distinctive" vehicle in a parking lot at the Cavalier Country Club Apart-

ments. The vehicle was occupied by two black males. Chandler noticed that the driver was wearing a dark winter wool hat. Chandler was suspicious because both men seemed to be slouching in their seats. Chandler testified that he recalled seeing the gold and red tassel hanging from the rearview mirror. Chandler lived in Building 10B, Capano Drive.

A number of the State's witnesses testified that they heard gunfire at approximately 7:40 a.m. These witnesses were all tenants of the buildings surrounding the parking lot at the Cavalier apartment complex. Their descriptions of what they saw varied. Two witnesses, Susan Butler ("Butler") and Philip Hudson ("Hudson"), testified that they saw a stocky black man wearing a dark blue sweatshirt or jacket and dark pants or blue jeans running across the parking lot immediately after hearing the gunfire.[6] This description matched Manley, who was wearing a dark blue pullover shirt and blue jeans when he was apprehended.

The witness called by the State who had the best vantage point at the time of the shooting was Lance Thompson ("Thompson"). He lived in a third floor apartment. When he heard four to six shots of gunfire, Thompson ran to his window which looked out over the parking lot. He saw a man get into the passenger side of the suspect vehicle. The vehicle, which had paint peeling off its top, backed up towards his apartment building and then exited the parking lot. Thompson had a clear look at the license number. He immediately wrote it down on a piece of paper so he would not forget the number.

Thompson exited his building and told Patrolman Daniel Meadows of the New Castle County Police Department that he had written down the vehicle's license number. Patrolman Meadows, who had just arrived at

5. Mario Cruz ("Cruz"), the boyfriend of Stevenson's mother, Delphine Brown, told the police on November 13, 1995, that Stevenson and Manley left Stevenson's house around 6:45 a.m. on that date. At trial, Cruz testified it was approximately 7 a.m. when Stevenson and Manley left. The Superior Court found that Cruz's in-court testimony was less credible than the initial statement he had given to the police.

6. Hudson noted that the man he saw was wearing a baseball cap and white sneakers. At the time of Manley's apprehension, he was wearing sneakers which were mostly white. At the time of Stevenson's apprehension, he was wearing black sneakers.

the scene, took the piece of paper and immediately had the number broadcast by the police dispatcher. That automobile license number was Delaware 727970. Patrolman Meadows gave the piece of paper back to Thompson following the broadcast.[7] The tag number was checked in the motor vehicle records. Those records showed the registered owner's address as being 206 West 20th Street, Wilmington, Delaware. This information was also broadcast by the police dispatcher.

### The Apprehension

Shortly after 8 a.m., Officers Murray, Witte, Danese and Stark of the Wilmington Police were dispatched to the area of Stevenson's residence, at 206 West 20th Street in the City of Wilmington. Upon arrival, Officer Murray exited his police vehicle and approached on foot two black men who were exiting the suspect vehicle. When the two men turned in Officer Murray's direction and saw him, they immediately got back into the Mercury Topaz and sped off. The vehicle turned left on Washington Street and then right on West 19th Street, heading down that street the wrong way. The vehicle jumped the curb on West 19th Street and sustained a flat tire.

The two men then led the police on a short foot chase. One of the men was apprehended after running out of an alley onto Washington Street, between West 18th Street and West 19th Street. This was Manley. The other man ran to the corner of West 18th Street and Baynard Boulevard where he boarded a bus. The police boarded the bus, located the suspect and removed him from the bus. This was Stevenson.

Both suspects had cuts on the palms of their hands and were breathing heavily. Stevenson was sweating. Manley was wearing a dark blue pullover shirt with an open collar and with three buttons at the top and blue jeans. Stevenson was wearing a dark green sweatshirt and blue jeans.

Following the arrests and before Stevenson was turned over to the New Castle County Police, the police placed Stevenson in Officer Danese's patrol vehicle. After his shift was over, Officer Danese inspected the interior of his patrol vehicle, according to normal police procedure. On the floor of the rear passenger space, in the area where Stevenson had been sitting, Office Danese found a piece of paper. Chona's name, address and phone number were written on this piece of paper.

The Mercury Topaz was impounded and removed to the New Castle County Police Headquarters. After the police obtained a search warrant, they searched the vehicle for evidence. From the trunk, the police retrieved a camouflage Army jacket with a Specialist E4 insignia on it. From a pocket of this jacket, the police retrieved 24 copper-jacketed 9 mm live rounds of ammunition. The live rounds were of the same type and from the same manufacturer as the cartridge cases recovered from the scene of the murder.

### State's Other Evidence

On the evening of November 12, 1995, Debbie Dorsey ("Dorsey"), was at the Cavalier Country Club apartment which she shared with Heath. At 7 p.m. or so, there was a knock at her door. She opened the door and observed a black man who asked whether Heath was home. She responded that he was not in but was expected to return at around 9 p.m. She had never seen this man before. He was wearing a puffy, black jacket and was a little shorter than Heath.[8] Dorsey knew Stevenson since she also worked at Macy's department store. She was sure it was not Stevenson even though the lighting was not very good. She had never met Manley.

In October 1994, Melissa Magalong had moved into the Newark residence where Heath used to live. At around 8 p.m. to 9 p.m. on November 12, 1995, she heard a knock on her door. She did not answer the

---

7. Thompson did not keep the piece of paper.

8. Heath was 5 feet, 10 inches tall. Detective Craig Weldon testified that Manley is 5 feet, 8 inches tall. There was also testimony that Stevenson appeared to be 3 or 4 inches taller than Manley.

door, although she heard male voices mumbling outside. The men went away.

The State also introduced evidence that Manley and Stevenson were together on the night before the murder. According to Anna Hawley, who was employed at the University of Delaware library, Stevenson worked at the library from 9 p.m. to midnight on the evening of November 12, 1995. She saw Stevenson with his friend, Manley, together at some point during Stevenson's shift. Janet Hedrick, an officer with the University of Delaware Police, saw Manley waiting for Stevenson at the library at around 11:45 p.m. He also saw Kevin Powlette ("Powlette"), Manley and Stevenson together after midnight on the morning of November 13, 1995.

The weapon used to murder Heath was never recovered. According to the State's evidence, about one week prior to the murder, Stevenson told his friend, Powlette, that he wanted to get a gun for his protection. Atomic absorption tests performed on the defendants' hands and clothing showed no traces of gunshot reside.

Agent Ron Dodson of the Bureau of Alcohol, Tobacco, and Firearms explained that a revolver is much more likely to leave gunshot residue than a semi-automatic. He also stated that there is less likelihood of gunshot residue being detected when a firearm is fired outside rather than inside. He further stated that the passage of time and intervening activity decreases the possibility of a positive result, at least in so far as the hands are concerned. He did say that gunshot residue would remain on clothing until the clothing was washed. Gunshot residue was detected on the jacket which Heath was wearing on the morning of his death.

Specialist First Class Richard Wohlgemuth testified that Manley was a member of his unit of the United States Army Reserve. He identified the jacket taken from Stevenson's vehicle as an Army-issued jacket. The size was extra large regular. According to Manley's Army records, his clothing size was extra large regular. He testified that Manley's rank was Specialist E4.

An agent from the Bureau of Alcohol, Tobacco and Firearms opined that the bullet and copper jacket fragments recovered from the scene and from the body of Heath were all compatible with the components of the copper-jacketed 9 mm Lugar rounds of ammunition recovered from the jacket. He also gave his expert opinion that all of those fragments which he was able to analyze were fired from the same weapon. He was of the opinion that the cartridge cases were all fired from the same semi-automatic weapon.

### Defendants' Trial Evidence

Neither Manley nor Stevenson testified. Both defendants, however, presented witnesses in their defense. Manley's mother, Rita Manley ("Mrs. Manley"), testified that her son graduated from high school in 1992. Thereafter, he joined the United States Army Reserve. She stated that the Army jacket taken from the trunk of Stevenson's car did not belong to her son. Mrs. Manley observed that on most weekends, her son and Stevenson were together. It was also not unusual for him to visit Stevenson at the University of Delaware.

Mrs. Manley recalled that on Sunday, November 12, 1995, Stevenson arrived at her home during the afternoon. He and her son watched a football game on television. According to Mrs. Manley, they left in the evening at around 6 p.m. to 6:30 p.m. to pick up Stevenson's sister, Elissa Brown ("Brown"). Myla Fisher ("Fisher") testified that the defendants were at her house on November 12, 1995, at around 6:45 p.m. to 7 p.m. to pick up Brown, who needed a ride home.[9]

Two cousins, an aunt, a friend of Manley's mother, and a Philadelphia police dispatcher all testified that Manley's reputation for peacefulness was very good. Stevenson's aunt and great aunt also testified as to his reputation for peacefulness. Brown testified as to Stevenson's reputation for peacefulness. She testified that a prior statement to the police, where she said that Stevenson and

---

9. The Superior Court noted that on cross-examination, Fisher testified that she had first reported the approximate time of the defendants' visit one to two weeks before trial, although the visit took place almost one year earlier.

Manley picked her up at Fisher's house on November 12, 1995, during the first quarter of the Dallas football game, must have been mistaken. She testified that she thought it was at the end of the game because it was dark.

Manley presented testimonial evidence from Dorothy Hackett. She testified by way of video deposition. She was at the Cavalier Country Club Apartments when Heath was murdered. She had identified Stevenson's photograph as the individual she had seen in the parking lot on the morning of November 13, 1995. Hackett also identified Stevenson during the course of her deposition, which both defendants attended. She testified that the person she saw was 5'8" to 5'9" tall, weighed about 160 pounds and was not stocky. She said the person she saw had his shirt sleeves pulled up so that she was able to see his forearms. She said his hands and face were very dark.[10] She described the person she saw as wearing a dark pullover shirt with buttons at the top. This description matched the pullover shirt Manley was wearing when he was apprehended. Hackett described the vehicle as being dark blue with numerous stains which appeared gray or silver. She thought the vehicle was parked facing out of the space and that the person she saw entered the driver's side.[11]

Detective Weldon was called in Stevenson's defense. He investigated whether Stevenson had ever purchased a handgun. He testified that his investigation revealed no evidence that Stevenson had attempted to make a legal purchase of a handgun. Detective Weldon also testified that there was a report during the pursuit of the defendants that a man with a green sweatshirt had been seen entering a church near where Stevenson was apprehended.[12]

### Jury Verdict after Trial

The jury began its deliberations on November 12, 1996. On the afternoon of November 13, 1996, the jury returned verdicts of guilty as to both Manley and Stevenson on all counts in the indictment: Murder in the First Degree, Conspiracy in the First Degree, Aggravated Act of Intimidation, Conspiracy in the Second Degree and two counts of Possession of a Firearm During the Commission of a Felony.

### Penalty Hearing and Death Sentence

A penalty hearing was conducted before the same jury for the purpose of making sentencing recommendations with regard to Manley and Stevenson. Testimony was presented by approximately thirty witnesses. After deliberating again, the jury unanimously concluded that four statutory aggravating circumstances existed with regard to each defendant. With regard to Manley, the jury concluded by a vote of seven to five that, considering both the aggravating and the mitigating circumstances, the aggravating circumstances outweighed the mitigating circumstances. With regard to Stevenson, the jury concluded by a vote of eight to four that, under the same weighing process, the aggravating circumstances outweighed the mitigating circumstances. In a forty-four page written opinion, the Superior Court explained the basis for its imposition of a death sentence on Manley and Stevenson. *See State v. Manley,* Del.Super., No. 9511007022, Barron, J., 1997 WL 27094 (Jan. 10, 1997) (Findings After Penalty Hearing).

### Severance Denied
### Discretion Properly Exercised

Manley argues that the Superior Court abused its discretion by denying his motion for a separate trial. *See State v. Manley,*

10. According to the Superior Court, the record reflects that Manley is far more dark-complected than Stevenson. Hackett agreed that Manley's complexion was darker than Stevenson's complexion.

11. The Superior Court found other evidence clearly suggested that the vehicle was faced into the parking space and had to back out in order to exit.

12. In rebuttal, the State recalled Officer Stark, who testified that the person who went into the church was older than Stevenson and that the sweatshirt was a lighter shade of green that Stevenson's. He also testified that the church was in a direction opposite that in which the chase had occurred.

Del.Super., No. 9511007022, Barron, J., 1996 WL 527322 (Aug. 1, 1996) (Mem.Op.) (denying Motion For Severance). Manley contends that his defense and that of his co-defendant, Stevenson, were mutually antagonistic.

■ Under Superior Court Criminal Rule 8(b),[13] two or more defendants may be charged in the same indictment, if they are alleged to have participated in the same act, or in the same series of acts. Ordinarily, when defendants are indicted jointly, they are also tried together. *Jenkins v. State,* Del.Supr., 230 A.2d 262, 272 (1967). If, however, the trial court finds that the joinder of defendants for trial will prejudice any of the parties, it may grant a motion for separate trials. Super. Ct.Crim. R. 14;[14] *Bradley v. State,* Del.Supr., 559 A.2d 1234 (1989).

■ The decision to grant or deny a motion for severance is addressed to the sound discretion of the trial judge. *Bradley v. State,* 559 A.2d at 1241; *Jenkins v. State,* 230 A.2d at 272; Super. Ct.Crim. R. 14. As a general rule, the factors to be considered when determining whether a motion for a separate trial should be granted are: problems involving a co-defendant's extra-judicial statements; an absence of substantial independent competent evidence of the movant's guilt; antagonistic defenses as between the co-defendant and the movant; and difficulty in segregating the State's evidence as between the co-defendant and the movant. *Robertson v. State,* Del.Supr., 630 A.2d 1084, 1093 (1993). *See Jenkins v. State,* 230 A.2d at 273.

■ The existence of mutually antagonistic defenses between co-defendants is a definite factor to be considered and can be determinative in deciding whether severance should be granted. *Bradley v. State,* 559 A.2d at 1242; *Jenkins v. State,* 230 A.2d at 273. *Cf. Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 937–38, 122 L.Ed.2d 317 (1993). In *Bradley,* this Court held that a defendant is entitled to severance when " 'the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant . . . .' " *Bradley v. State,* 559 A.2d at 1241 (quoting *State v. Vinal,* Conn. Supr., 198 Conn. 644, 504 A.2d 1364, 1368 (1986)). "[T]he presence of hostility between a defendant and his co-defendant or 'mere inconsistencies in defenses or trial strategies,' " however, does not require severance *per se. Outten v. State,* Del.Supr., 650 A.2d 1291, 1298 (1994) (citation omitted). *See Zafiro v. United States,* 506 U.S. at 538, 113 S.Ct. at 937–38.

The Superior Court denied the pre-trial motion for a severance of Manley's and Stevenson's trials in a carefully written opinion, which stated, in part, the following:

Here, both defendants appear to argue that mutually antagonistic defenses are present in this case because the evidence indicates that only one of them committed the lethal act. Neither defendant gave a statement to the police and neither defendant has proffered to this Court what the core of his defense is. In the final analysis, all that the defendants are offering to this Court is the hypothesis that mutually antagonistic defenses exist, without any evidence to suggest that they exist in fact. What seems apparent is the belief of each defendant that his chances for acquittal would be enhanced by severance. That rationale was insufficient even prior to *Zafiro v. United States.*

13. Superior Court Criminal Rule 8(b) provides:

*Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

14. Superior Court Criminal Rule 14 provides:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trial of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney to deliver to the court for inspection in camera any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.

*State v. Manley,* Del.Super., No. 9511007022, Barron, J., 1996 WL 527322 (Aug. 1, 1996) (Mem.Op.). *See United States v. Martinez,* 1st Cir., 922 F.2d 914, 922 (1991). We have examined the merits of Manley's motion to sever his trial from Stevenson's and have reached the same conclusion.

The record reflects that neither Manley nor Stevenson testified, and neither presented evidence that directly implicated the other in their own defenses. The record also reflects that only one defendant fired the fatal shots that killed Heath. There were no eyewitnesses to the actual moment of the shooting. According to Manley,

> the mutual antagonism first surfaced during the cross-examination of the State's expert, Agent Dodson. Counsel for appellant [Manley] elicited testimony from Agent Dodson that introduced to the jury the fact that only one gun was fired. The jury was left to draw the inescapable inference that only one man did the shooting. With this testimony, the downward spiral into finger pointing and co-defendant enmity which robbed both defendants of fair trails begins.

It is not logical to suggest that the Superior Court erred by denying a pretrial motion to sever Manley's trial when the alleged prejudice "first surfaced" during the cross-examination of a State's witness by Stevenson's attorney, which occurred during the State's case-in-chief. Moreover, Manley's legal culpability is the same whether he was convicted as a principal or as an accomplice in Heath's murder. *See* 11 *Del. C.* §§ 271, 275; *Skinner v. State,* Del.Supr., 575 A.2d 1108, 1124 (1990). Under Delaware law, where "the defendants agreed to [commit the crime, and] either defendant might have functioned as an accomplice who intended to promote or facilitate the subsequent acts of the other defendant as a principal, ... both [are] equally guilty of the consequential crimes ...." *Claudio v. State,* Del. Supr., 585 A.2d 1278, 1282 (1991). *See* 11 *Del. C.* § 271.

Nevertheless, Manley contends that the cross-examination of witnesses by Stevenson's attorney damaged Manley's defense as much, if not more, than the prosecutor's questions. Manley also asserts that the closing argument by Stevenson's attorney was prejudicial to Manley's defense. These contentions reflect the Superior Court's pretrial observation, in denying the motions for severance, that Manley and Stevenson both felt they would benefit from separate trials.

A trial judge should "grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. at 539, 113 S.Ct. at 938. The record reflects that there was substantial independent direct and circumstantial evidence to establish Manley's guilt for murder and the other charges in this case. The record reflects that Manley has failed to sustain his burden of establishing substantial injustice and unfair prejudice. Thus, we hold that Manley was not prejudiced by a joint trial, i.e., denied a specific trial right or tried by a jury which could not make a reliable judgment about his individual guilt or innocence. *See Zafiro v. United States,* 506 U.S. at 538, 113 S.Ct. at 937–38.

### *Life Qualified Voir Dire*
### *Open–Ended Questions Discretionary*

In Delaware, *voir dire* is conducted by the judge. Prior to jury selection, Manley requested the Superior Court to conduct a probing and open-ended *voir dire,* in an effort to identify any prospective jurors whose viewpoints about the death penalty might substantially impair their ability to recommend a sentence of life imprisonment. The Superior Court denied that request. It decided to ask the following two "life qualifying" questions:

> Do you believe that anyone who takes another person's life automatically forfeits his right to live?

> In the event that the jury found either defendant guilty in this case of first degree murder, would you automatically vote in favor of the death penalty regardless of the presence of any mitigating circum-

stances and regardless of Court's instructions on the law?

In denying Manley's request for open-ended *voir dire,* the Superior Court stated, in part:

> This [jury *voir dire* ] is not a set script. I mean, I've discovered that some of the answers, you know, automatically, I think, common sense, lead to other questions that aren't even on here. Okay, and while I choose not to give such an open ended initial question as what are your views on the death penalty, I know—I mean we could go on … that issue. The statute directs the court to focus on whether they have any conscientious scruples against the imposition of the death penalty and, if they do, whether they can set those scruples aside and obey the rule of law.
>
> Now, I think that's the heart of the matter for which the court has to direct its questions to the jury in this *voir dire,* but I—I know in other cases I have gotten answers, well, I'm not sure. You know, you do open up the doors there. What do you mean you're not sure? Explain what you mean. And they might go into, well, my philosophical position is—and I'm not going to interrupt them and say, excuse me, just limit your answer, you know.
>
> And I'm not foreclosing that in this case in the sense that if it seems to follow that that question is a logical successor to the answer which has been given by the prospective juror, I'll certainly ask that question and others like them.

The record reflects that the Superior Court conducted individual *voir dire* of 204 prospective jurors over six days, before seating the twelve jurors and four alternates in Manley and Stevenson's joint trial. Exactly 100 prospective jurors were excused for cause for a variety of reasons. Consequently, 104 prospective jurors were asked *voir dire* questions about the death penalty. Eighteen (18) jurors (17.3%) were excused for cause by the Superior Court because they were not deemed to be "life qualified." Conversely, 19.2% (20 jurors) were excused for cause because they were not deemed to be "death qualified."

The primary purpose of *voir dire* examination is to elicit prospective jurors' bias or prejudice. *DeShields v. State,* Del. Supr., 534 A.2d 630, 634 (1987). The goal is to secure for the defendant and the State an impartial jury that will be able to decide the case on the basis of the evidence presented at trial and follow the court's instructions on the law. *Id.; Hughes v. State,* Del.Supr., 490 A.2d 1034, 1041 (1985). The standard for excluding a juror for cause, as a result of the juror's views on capital punishment, is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (citation omitted); *Morgan v. Illinois,* 504 U.S. 719, 728–29, 112 S.Ct. 2222, 2229–30, 119 L.Ed.2d 492 (1992). *See also Jackson v. State,* Del. Supr, 684 A.2d 745, 749 (1996); *DeShields v. State,* 534 A.2d at 634.

The record reflects that the Superior Court conducted the "life qualifying" inquiry required by *Morgan.* *See Witherspoon v. Illinois,* 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968). The Superior Court asked generally whether each prospective juror believed that one person who kills another automatically forfeits his right to live. The Superior Court also asked specifically whether each prospective juror would, upon finding Manley or Stevenson guilty of first degree murder, automatically vote to impose the death penalty. *See Morgan v. Illinois,* 504 U.S. at 723, 734–36, 112 S.Ct. at 2226–27, 2232–34.

"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do" and is not qualified to sit on the jury. *Morgan v. Illinois,* 504 U.S. at 729, 112 S.Ct. at 2229. *See Ross v. Oklahoma,* 487 U.S. 81, 85–86, 108 S.Ct. 2273, 2276–77, 101 L.Ed.2d 80 (1988). In Manley's case, the record reflects that when a prospective juror expressed a constitutionally unacceptable view in response to the life-qualified inquiry required by *Morgan,* the trial judge asked whether the juror

could set that view aside, be impartial, and follow the court's instructions on the law. Manley challenges the Superior Court's follow-up questions and has characterized them as improper "rehabilitation."

"The [United States] Constitution ... does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. at 729, 112 S.Ct. at 2230. In interrogating a prospective juror about his or her view of the death penalty, the New Jersey Supreme Court found that "open-ended questions requiring the juror to articulate those views in his or her own words are preferable." *State v. Perry*, 124 N.J. 128, 590 A.2d 624, 637 (1991). Nevertheless, open-ended questioning is not required in order for the *voir dire* to be constitutionally adequate. *See State v. Kreutzer*, Mo.Supr., 928 S.W.2d 854, 864 (1996). *See also United States v. Tipton*, 4th Cir., 90 F.3d 861, 878 (1996).

In order to identify unqualified jurors, the "[v]oir dire must be probing enough to reveal jurors' prejudices ... so that counsel may exercise their challenges in an informed manner." *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535, 550 (1996). The *voir dire* conducted by the Superior Court in Manley's case was adequate for the trial judge to ascertain whether each prospective juror would be impartial. It also was sufficient to enable Manley's attorney to evaluate each juror for the purpose of either making a motion to excuse a juror for cause or exercising a peremptory challenge. Accordingly, we hold that the Superior Court properly exercised its discretion in conducting *voir dire* of the individual jurors in Manley's capital murder trial.

### Juror Challenges
### Record Supports Rulings

In Delaware, a juror in a capital case may be excused for cause when that juror's views on the death penalty would prevent or "substantially impair" the performance of his or her duties, in accordance with the Superior Court's instructions and the juror's oath. *DeShields v. State*, Del.

Supr., 534 A.2d 630, 634 (1987); *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Juror bias need not be proved with unmistakable clarity. *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852. Potential jurors may not know what their reaction will be when faced with imposing the death sentence, may be unable to articulate their true feelings, or may want to hide their true feelings. *Id.* at 424–25, 105 S.Ct. at 852–53.

The trial judge has broad discretion in deciding whether prospective jurors should be excused for cause. *DeShields v. State*, 534 A.2d at 634. The role of the trial judge, who observes a juror who may be "wrestling with his conscience," is paramount. The trial judge's exercise of his or her discretion will be disturbed only on a showing of abuse of discretion and actual prejudice. *DeShields v. State*, 534 A.2d at 634.

In Manley's case, the Superior Court granted the State's motion to excuse prospective jurors George Bolduc ("Bolduc") and Elwood Keplinger ("Keplinger") for cause. The Superior Court determined that these two prospective jurors held views that would impair their ability to serve impartially. Prospective juror Bolduc's responses to the Superior Court's questions reflected serious reservations regarding his willingness and ability to follow the penalty phase instructions. The Superior Court's decision to excuse him for cause is supported by the record. Prospective juror Keplinger was also excused for cause. Manley did not object to Keplinger's removal. Manley is procedurally barred from asserting claim on appeal regarding Keplinger, in the absence of plain error. Supr. Ct. R. 8.

The Superior Court denied defense motions to excuse prospective jurors Ellen Laucius ("Laucius"), William Kuck ("Kuck"), and Sharon Jack ("Jack") for cause. Each of these three prospective jurors were subsequently the subject of a peremptory challenge by either Manley or Ste-

venson.[15] According to Manley, their initial answers during *voir dire* reflected that they would automatically impose the death penalty upon finding the defendants guilty of first degree murder. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992).

■ The record reflects that the Superior Court thoroughly questioned Laucius, Kuck and Jack about their view of the death penalty, their ability to put aside his or her opinion, to follow the court's instructions on the law, and to recommend a life sentence if the facts so dictated. *See DeShields v. Snyder*, D.Del., 829 F.Supp. 676, 690–91 (1993). The Superior Court's examination of Laucius covered over twenty-two pages of trial transcript. Kuck's *voir dire* was approximately thirteen pages in length. Jack's questioning covered ten pages. Each of the three jurors assured the Superior Court that, regardless of his or her personal view, they could follow the court's instructions and recommend a life sentence if warranted by the evidence.

■ The predominant function of the trial judge in determining whether a juror is biased is assessing the credibility of the juror. *Wainwright v. Witt*, 469 U.S. at 429, 105 S.Ct. at 854–55. The basis for this assessment is not easily determined from the record on appeal. *Id.* It is for this reason that appellate tribunals accord deference to the trial court's findings. *DeShields v. State*, 534 A.2d at 636. The record reflects that the Superior Court did not abuse its discretion in excusing prospective jurors Bouldec and Keplinger for cause or in refusing to excuse prospective jurors Lucius, Kuck and Jack.

### Stevenson's Statement
### Properly Admitted Evidence

Manley also contends that a pretrial statement by Stevenson should not have been admissible into evidence at trial. The Supe-

rior Court permitted Officer Danese to testify that when Stevenson was apprehended and placed in a police vehicle, Stevenson said: "I don't know why you were chasing me from my car." According to Manley, because Stevenson did not testify at trial, the admission into evidence of Stevenson's brief pretrial statement to police violated the right of confrontation guaranteed to Manley by the United States Constitution. Manley argues:

> Absent this statement, there is no further evidence linking Manley to Stevenson's car on the morning of his arrest, save fingerprints which can easily be explained away due to the prior relationship of the defendants and a jacket which offers at best a tenuous connection between Manley and Stevenson's car. There is no eye witness who can positively place Manley in Stevenson's car at the scene of the murder or at the time of the arrest. Manley is seen, however, running along side of Stevenson briefly, before Manley changes direction, running away from Stevenson. Stevenson's statement then lead the jury to believe that the two defendant's fled from the car together. Hence, the jury must have considered Stevenson's statement against Manley. This conclusion is inescapable. The problem is compounded by the absence of any limiting instruction.

■ The United States Supreme Court has held that a defendant is deprived of his rights under the Confrontation Clause when a nontestifying co-defendant's confession, incriminating the defendant, is introduced at their joint trial, even if the jury is instructed to consider the confession only against the co-defendant. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). For *Bruton* to apply, however, a co-defendant's statement must be clearly inculpatory standing alone. *United States v. Arias*, 11th Cir., 984 F.2d 1139, 1142 (1993); *Vincent v. Parke*, 6th Cir., 942 F.2d 989, 991 (1991). A co-defendant's statement

---

**15.** Manley used a peremptory challenge to strike Laucius and Kuck; Stevenson used a peremptory to strike Jack. Because trial counsel utilized peremptory challenges to strike Laucius, Kuck, and Jack, they were not seated as jurors. However, the loss of a peremptory challenge did not violate Manley's Sixth Amendment right to an impartial jury. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988).

is admissible, however, where the statement is not incriminating on its face but becomes so only when linked to other evidence introduced later at trial. *Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 1707–08, 95 L.Ed.2d 176 (1987).

Stevenson's statement was not a confession. Stevenson's statement, standing alone, also does not implicate Manley. Stevenson's statement is incriminating as to Manley only when it is linked to other evidence in the State's case. Accordingly, the admission of Stevenson's statement as evidence did not violate Manley's rights under the Confrontation clause of the United States Constitution. *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

Alternatively, Manley argues that if Stevenson's statement was admissible as evidence, the Superior Court should have given a limiting instruction. The record reflects that Manley's defense counsel objected to Stevenson's statement on hearsay grounds but did not request a limiting instruction. Nevertheless, the record reflects that the Superior Court did carefully instruct the jury in an effort to eliminate any potential "spillover" effect in the evidence resulting from the joint trial of Stevenson and Manley. *See Skinner v. State,* Del.Supr., 575 A.2d 1108, 1120 (1990) (citing *Lampkins v. State,* Del. Supr., 465 A.2d 785, 795 (1983)).[16] The Superior Court's final instructions specifically directed the jury to segregate and consider the evidence separately as to each defendant. *See Robertson v. State,* Del.Supr., 630 A.2d 1084, 1094 (1993). *See also Skinner,* 575 A.2d at 1120 (citing *Lampkins v. State,* 465 A.2d at 795 and *United States v. Cresta,* 1st Cir., 825 F.2d 538, 554–55 (1987)). Thus, Manley's alternative argument is not supported by the record.

### DEATH PENALTY STATUTORILY MANDATED REVIEW

This Court will now undertake the review that is statutorily mandated fol-

lowing the imposition of a death sentence in Delaware. 11 *Del. C.* § 4209(g). *See, e.g., Jackson v. State,* Del.Supr., 684 A.2d 745, 754 (1996); *Gattis v. State,* Del.Supr., 637 A.2d 808, 821–23 (1994); *Dawson v. State,* Del. Supr., 637 A.2d 57, 65–68 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 948–51 (1994); *Wright v. State,* Del.Supr., 633 A.2d 329, 339–43 (1993). Although the statutory review by this Court is limited, that review is not perfunctory. *Dawson v. State,* 637 A.2d at 65. *See Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). A death sentence may be imposed only in accordance with the bifurcated procedure prescribed by 11 *Del. C.* § 4209. Section 4209(g)(2) provides as follows:

> The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:
>
> a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.
>
> b. Whether the evidence supports the judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

11 *Del. C.* § 4209(g)(2). In performing its mandatory statutory review, this Court remains cognizant that "death as a punishment is unique in its severity and irrevocability." *Dawson v. State,* 637 A.2d at 66 (quoting *Pennell v. State,* Del.Supr., 604 A.2d 1368, 1375 (1992) (citation omitted)).

This Court has traditionally commenced its mandatory statutory review by initially addressing subparagraph (b) of Section 4209(g)(2). That subsection requires this

---

**16.** The jury was instructed to consider the liability of each defendant separately. The jury was also advised that a conclusion reached with regard to one defendant does not mean that the same conclusion will apply to the other defendant. *See Robertson v. State,* Del.Supr., 630 A.2d 1084, 1094 (1993); *Skinner v. State,* 575 A.2d at 1120.

Court to examine the evidence in the record to determine whether it supports the findings of the Superior Court judge which relate to the establishment of statutory aggravating circumstances. 11 *Del. C.* § 4209(e). Thereafter, two additional inquiries are required by subparagraph (a) of Section 4209(g)(2): first, whether the Superior Court judge's imposition of the death penalty was either arbitrary or capricious; and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under this statute. Each question requires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender.

*Wright v. State,* 633 A.2d at 339 (quoting *Red Dog v. State,* Del.Supr., 616 A.2d 298, 306–07 (1992)) (certain citations and quotation marks omitted); *Gattis v. State,* 637 A.2d at 821; *Dawson v. State,* 637 A.2d at 66; *Sullivan v. State,* 636 A.2d at 949. *See generally Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

### *Capital Sentencing Phases*
### *Eligibility and Selection*

These are two phases in Delaware's capital sentencing process. *Cf. Buchanan v. Angelone,* 522 U.S. ——, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). The eligibility phase narrows the class of death-penalty-eligible defendants by requiring the State to prove the existence of at least one statutorily defined aggravating circumstance. *See id.* In the eligibility phase, the jury recommends an answer to the following question:

> Whether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance as enumerated in subsection (e) of this section . . . .

11 *Del. C.* § 4209(c)(3)a.1. If the State discharges that burden, the selection phase follows and a determination is made whether to impose a sentence of life or death on the death-penalty eligible defendant. *Buchanan v. Angelone,* 522 U.S. ——, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). In the selection phase,

the jury recommends an answer to the following question:

> Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

11 *Del. C.* § 4209(c)(3)a.2. During the eligibility phase in Manley's case, the jurors answered the statutory question in the affirmative by a unanimous vote, with regard to the existence of four separate aggravating statutory circumstances. During the selection phase, the jury answered the second statutory question with seven affirmative votes and five negative votes.

### *Statutory Aggravating Circumstances*
### *Record Evidence Supports All Findings*

The State contended that four statutory aggravating circumstances were applicable in this case:

1. The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing the witness's appearance and testimony in a criminal proceeding involving the crime. *See* 11 *Del. C.* § 4209(e)(1)g.

2. Defendant Stevenson caused or directed another to commit murder. Defendant Manley committed murder as an agent of another person. *See* 11 *Del. C.* § 4209(e)(1)m.

3. At the time of the killing, the victim had provided a police agency with information concerning criminal activity, and the killing was in retaliation for the victim's activities in providing information concerning criminal activity to a police agency. *See* 11 *Del. C.* § 4209(e)(1)t.

4. The murder was premeditated and the result of substantial planning. *See* 11 *Del. C.* § 4209(e)(1)u.

The jury and trial judge concluded that the State's evidence established the existence of those four statutory aggravating circumstances beyond a reasonable doubt. Al-

though Manley has not challenged those findings and conclusions, we have carefully reviewed each of the four alleged aggravating statutory circumstances in Stevenson's appeal. *Stevenson v. State*, Del.Supr., 709 A.2d 619 (1998).

## Death Penalty
## Not Arbitrary or Capricious

The Superior Court was satisfied that the State had proven by substantial and reliable evidence the existence of the following non-statutory aggravating circumstances, some of which apply only to Stevenson, one of which applied only to Manley, and some of which apply to both defendants: victim impact; at the time of murder, Heath was unarmed and unable to defend himself since he was shot in the back; Chona's name, address and telephone number were in Stevenson's possession, making him (Chona) a potential victim; [17] Stevenson's theft of approximately $4,500 from Macy's by fraudulently obtaining Macy's gift certificates; Stevenson's statement to Detective Ford that he committed the thefts as a result of a debt he owed to a Philadelphia gang; Stevenson viewed Heath's life as less significant than a blemish on his criminal record; Manley killed Heath, a complete stranger who had never caused him any harm; and, Heath was a completely innocent victim who was killed merely for doing his job.

The Superior Court found that the following mitigating circumstances existed with regard to Manley: the absence of any prior criminal conviction; his youth; [18] his love for his family and their love for him; the devastating impact a death sentence would have upon his family; his positive personality traits; his positive contributions to society through his service in the United States Army Reserve and the help which he has given to family and friends; his potential for rehabilitation; his caring for and ability to help others; and his desire to better himself.

" 'The procedure to be followed by the trial judges … is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.' " *State v. Cohen*, Del.Supr., 604 A.2d 846, 849 (1992) (quoting *State v. Dixon*, Fla.Supr., 283 So.2d 1, 10 (1973)). In its sentencing decision, the Superior Court considered the statutory aggravating circumstances alleged by the State. It also carefully reviewed the non-statutory aggravating circumstances established by the State and the mitigating evidence presented by Manley. After setting forth its analysis of the statutory and non-statutory aggravating circumstances, as well as the mitigating circumstances, the Superior Court weighed them. The Superior Court then announced its sentencing decision, stating, in part:

> On the morning of November 13, 1995, the day Heath was to testify at Stevenson's trial, Stevenson and Manley lay in wait for the unsuspecting victim to merge from his apartment. When Heath appeared, Manley went into action.
>
> Manley approached Heath as he was facing the rear of his jeep. Manley walked up behind the unarmed and defenseless victim and pumped five 9 mm copper-jacketed bullets into his body. Upon accomplishing their intended mission of death, the defendants sped from the scene in their futile attempt to elude detection.
>
> This Court cannot recall a more chilling and premeditated, execution-style murder than was conclusively proven in this case. A security officer was preparing to go to court to seek redress on behalf of his employer. That this route was short-circuited by his elimination constitutes an attack upon the very foundations of our judicial branch of government.

---

**17.** The Superior Court found that a reasonable inference could be drawn that Chona was a potential target. Because the exact reason for Stevenson to have been carrying this information on his person cannot be determined with certainty, the Superior Court gave this non-statutory aggravating circumstance only minimal weight.

**18.** The Superior Court noted that Manley was 21 years old at the time of the murder.

Utter contempt and disdain for the judicial process were evidenced by Manley's and Stevenson's premeditated and outrageously cold-blooded assassination of a wholly innocent witness to a crime. Is the most extreme form of punishment warranted in this case?

Manley and Stevenson are not hardened criminals. Everything in their backgrounds ostensibly points in favor of mitigation. At the same time, the defendants' backgrounds offer no excuse for what they did on November 13, 1995. These were not drug-addicted sociopaths off on a rampage. Indeed, Manley and Stevenson are intelligent and gifted young men with support and potential. Arguably, their backgrounds magnify the ignominy of the premeditated murder which they committed.

Manley, in his December 11, 1996, supplemental submission to the Court, argued that the death penalty is only warranted in a case involving both a despicable set of facts and a despicable defendant. Yet, the death penalty is reserved for either "the worse criminals *or the criminals who commit the worst crimes* ..." *Furman v. Georgia,* 408 U.S. 238, 294, 92 S.Ct. 2726, 2754–55, 33 L.Ed.2d 346 (1971) (Brennan, J., concurring) (emphasis added). Similarly, "certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the death penalty." *Gregg v. Georgia,* 428 U.S. 153, 184, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976). In this Court's view, the calculated and cowardly execution of a State's witness constitutes a case calling for such a response.

The murder of Kristopher Heath was horrific and shocking. The particular circumstances or details of the commission of the offense so heavily outweigh the mitigating character and propensities of each offender that, along with the other aggravating circumstances found to exist, a sentence of death is warranted for both defendants.

■ The record reflects that the Superior Court carefully considered the totality of the evidence in aggravation and mitigation, which related to the particular circumstances of the murder of Heath, as well as to the character and propensities of Manley. *See* 11 *Del. C.* § 4209(g)(2)a; *Dawson v. State,* Del.Supr., 637 A.2d 57, 67 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 950 (1994). The record reflects that the Superior Court's decision to impose the death sentence was "the product of a deliberate, rational and logical deductive process." *Red Dog v. State,* Del.Supr., 616 A.2d 298, 310 (1992). After a careful review of the entire record, this Court concludes that the sentence of death was not imposed upon Manley by the Superior Court either arbitrarily or capriciously. 11 *Del. C.* § 4209(g)(2)a.

### *Death Penalty Proportionality Review*

■ The final issue that this Court must analyze in its mandatory review is whether the Superior Court judge's imposition of the death penalty upon Manley was disproportionate to the penalty imposed in other cases arising under the Delaware death penalty statute. 11 *Del. C.* § 4209(g)(2)a. In answering that inquiry, this Court has reviewed the "universe" of cases. (*See* Appendix). The "universe" of cases is comprised of those First Degree Murder cases which have included a penalty hearing and in which the sentence has become final, either without or following a review by this Court. *Ferguson v. State,* Del.Supr., 642 A.2d 772, 789 (1994). Section 4209 was amended in 1991 by Chapter 189 of Delaware Laws Volume 68. "Although the significant 1991 changes in the statutory scheme create a significant dissimilarity between the pre–1991 cases and the post–1991 cases in the universe, pre–1991 jury decisions are nevertheless 'pertinent' to our proportionality analysis." *Lawrie v. State,* Del.Supr., 643 A.2d 1336, 1350 (1994).

■ Manley argues that his death sentence is disproportionate. He cites other instances in the Delaware universe of cases, in which nine jurors recommended a death sentence and three opposed, but the defendant was given a sentence of life in prison by the Superior Court. The Delaware Death Penalty Statute was revised in 1991. Under the current law, "[t]he jury's function [in the

sentencing phase of a capital murder proceeding] is purely advisory. The Superior Court judge may completely reject the recommendation of the jury." *Lawrie v. State,* 643 A.2d at 1346. The final decision between a sentence of life in prison or death is now vested exclusively with the judge of the Superior Court presiding over the particular case. *Shelton v. State,* Del.Supr., 652 A.2d 1, 5 (1995).

We have compared Manley's sentence with the penalties imposed in the universe of all First Degree Murder cases which have included a death penalty hearing. We have also considered objective factors such as the gravity of the offense, the circumstances of the crime, and the severity of the penalty. *See Red Dog v. State,* Del.Supr., 616 A.2d 298, 311 (1992). Contrary to Manley's contention, a death sentence is not disproportionate *per se,* simply because he had no prior record of violent criminal conduct.

The record in Manley's case reflects the existence of four statutory aggravating circumstances and significant non-statutory aggravating circumstances. *Dawson v. State,* Del.Supr., 637 A.2d 57, 68 (1994). In its sentencing decision, the Superior Court stated, "Utter contempt and disdain for the judicial process were evidenced by Stevenson's and Manley's premeditated and outrageously cold-blooded assassination of a wholly innocent witness to a crime." Like others sentenced to death in Delaware, Manley was found guilty of committing an unprovoked, cold-blooded, execution-style murder of a defenseless person. *Red Dog v. State,* 616 A.2d at 311; *Gattis v. State,* Del.Supr., 637 A.2d 808, 823 (1994); *Dawson v. State,* 637 A.2d at 68; *Sullivan v. State,* Del.Supr., 636 A.2d 931, 950–51 (1994); *Wright v. State,* Del. Supr., 633 A.2d 329, 343 (1993).

"Sentencing decisions involve 'difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system.'" *Wright v. State,* 633 A.2d at 342–43 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987) (citation omitted)). This Court has consistently noted in prior cases involving proportionality review that "[a] definitive comparison of the 'universe' of cases is almost impossible." *Red Dog v. State,* 616 A.2d at 311. *See also Gattis v. State,* 637 A.2d at 823; *Dawson v. State,* 637 A.2d at 68; *Sullivan v. State,* 636 A.2d at 950. This Court has concluded that the Superior Court judge's imposition of a sentence of death upon Manley was not disproportionate to the sentences imposed on other defendants in the relevant universe of cases involving death penalty hearings in Delaware. 11 *Del. C.* § 4209(g)(2)a.

### *Conclusion*

This Court has carefully reviewed the entire record and has considered and rejected all claims of error raised by Manley in this appeal. The evidence clearly supports the Superior Court judge's finding that three statutory aggravating circumstances were established beyond a reasonable doubt. 11 *Del. C.* § 4209(e), (g)(2)b.

This Court has concluded that the death sentence imposed upon Manley was imposed neither arbitrarily nor capriciously. This court has also determined that Manley's death sentence is not comparatively disproportionate to the sentences imposed in other First Degree Murder cases that have proceeded to a penalty hearing pursuant to the Delaware death penalty statute. 11 *Del. C.* § 4209(g)(2)a. *See Gattis v. State,* Del.Supr., 637 A.2d 808, 821–23 (1994); *Dawson v. State,* Del.Supr., 637 A.2d 57, 67–69 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 950–51 (1994). Accordingly, the underlying convictions and judgments, including the judgments imposing sentences of death for each count of Murder in the First Degree, are AFFIRMED.

The matter is remanded to the Superior Court for further proceedings consistent with this opinion and the setting of a new date of execution. *See* Super. Ct.Crim. R. 61(*l*). This Court's order of January 16, 1997, staying the execution of Manley's death sentence, shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be hand-delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

# APPENDIX

## CASES DECIDED UNDER
## 11 *Del. C.* § 4209

### As Amended in 1991 by

### 68 Del. Laws Ch. 189 [19]

| | |
|---|---|
| Case Name: | Meri–Ya C. Baker |
| Case No.: | IN90–12–1039, 1040 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 360, 1992, 1993 WL 557951, Holland, J. (Dec. 30, 1993) (ORDER) |

| | |
|---|---|
| Case Name: | Jermaine Barnett |
| Case No.: | IN97–02–1238, 1131, 1334 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |

| | |
|---|---|
| Case Name: | Hector S. Barrow |
| Case No.: | IN97–02–1353, 1356, 1359 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |

| | |
|---|---|
| Case Name: | James B. Clark, Jr. |
| Case No.: | IN94–06–0543 through 0548 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 672 A.2d 1004 (1996) |

| | |
|---|---|
| Case Name: | Charles M. Cohen |
| Case No.: | IN90–02–0474 thru 0477 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No direct appeal taken |

| | |
|---|---|
| Case Name: | James T. Crowe |
| Case No.: | IN95–12–1167 thru 1169 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | Direct appeal pending |

| | |
|---|---|
| Case Name: | David F. Dawson |
| Case No.: | IK86–0024; IK87–01–0841; 0843, 0845 |
| County: | New Castle (venue changed) |
| Sentence: | Death |
| Decision on Appeal: | 637 A.2d 57 (1994) |

| | |
|---|---|
| Case Name: | Byron S. Dickerson |
| Case No.: | IN90–12–1041, 1042 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 353, 1992, 1993 WL 541913, Veasey, C.J. (Dec. 21, 1993) (ORDER) |

| | |
|---|---|
| Case Name: | Cornelius E. Ferguson |
| Case No.: | IN91–10–0576, 0578 thru 0581 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 642 A.2d 772 (1994) |

| | |
|---|---|
| Case Name: | Robert A. Gattis |

| | |
|---|---|
| Case No.: | IN90–05–1017 thru 1019, 1106, 1107 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 637 A.2d 808 (1994) |

| | |
|---|---|
| Case Name: | Arthur Govan |
| Case No.: | 92–01–0166 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 363, 1993, 1995 WL 48359, Walsh, J. (Jan. 30, 1995) (ORDER) |

| | |
|---|---|
| Case Name: | Robert W. Jackson, III |
| Case No.: | IN–92–04–1222 thru 1227; IN92–04–1348 and 1349 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 684 A.2d 745 (1996) |

| | |
|---|---|
| Case Name: | Mark Anthony Kirk |
| Case No.: | IN96–12–0754 and 0755, IN97–01–1773 thru 1776, IN96–12–0556 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | Direct appeal pending |

| | |
|---|---|
| Case Name: | David J. Lawrie |
| Case No.: | IK92–08–0179 thru 0185; IK92–09–0148 and 0149 |
| County: | Kent |
| Sentence: | Death |
| Decision on Appeal: | 643 A.2d 1336 (1994) |

| | |
|---|---|
| Case Name: | Thomas M. Magner |
| Case No.: | IN96–01–0258 and 0259, IN96–01–1421 thru 1425 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | Direct appeal pending |

| | |
|---|---|
| Case Name: | Michael R. Manley |
| Case No.: | IN95–11–1323 thru 1325, IN95–12–0684 thru 0686 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |

| | |
|---|---|
| Case Name: | Frank W. Moore, Jr. |
| Case No.: | 92–09–0001, 0002, 1001, 2001, 3001 |
| County: | Sussex |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 214, 1993, 1994 WL 202289, Holland, J. (May 9, 1994) (ORDER) |

| | |
|---|---|
| Case Name: | Jack F. Outten |
| Case No.: | IN92–01–1144 and 1145 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 650 A.2d 1291 (1994) |

| | |
|---|---|
| Case Name: | James W. Perez |
| Case No.: | IN–93–02–1191 and 1197 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 207, 1993, Moore, J. (Feb. 3, 1994) (ORDER) |

| | |
|---|---|
| Case Name: | James Allen Red Dog |

---

**19.** The universe of cases prior to 1991 is set forth in prior opinions by this Court and those appendices are incorporated herein by reference. *See, e.g., Lawrie v. State,* Del.Supr., 643 A.2d 1336, 1352–56 (1994).

Case No.: IN 91–02–1495 to 1503
County: New Castle
Sentence: Death
Decision on Appeal: 616 A.2d 298 (1992)

Case Name: Jose Rodriguez
Case No.: IN93–020–1121
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 466, 1993, 1994 WL 679731, Walsh, J. (Nov. 29, 1994) (ORDER)

Case Name: Nelson W. Shelton
Case No.: IN–92–01–1154 and 1155
County: New Castle
Sentence: Death
Decision on Appeal: 652 A.2d 1 (1995)

Case Name: Steven W. Shelton
Case No.: IN–92–01–1149 and 1150
County: New Castle
Sentence: Death
Decision on Appeal: 650 A.2d 1291 (1994)

Case Name: Donald J. Simmons
Case No.: IN92–01–0770 thru 0772; IN92–01–1140 and 1141
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No direct appeal taken

Case Name: Brian David Steckel
Case No.: IN96–06–1761 and 1762, IN96–06–1765 thru 1767, IN96–06–1773
County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending

Case Name: David D. Stevenson
Case No.: IN95–12–0687 thru 0689, IN95–11–1047 thru 1049
County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending

Case Name: Willie G. Sullivan
Case No.: IK–01–0192 thru 0196; IK92–02–0001; IK92–03–0022
County: Kent
Sentence: Death
Decision on Appeal: 636 A.2d 931 (1994)

Case Name: Antonio L. Taylor
Case No.: IK94–06–0047 through 0052
County: Kent
Sentence: Life Imprisonment
Decision on Appeal: 685 A.2d 349 (1996)

Case Name: Charles H. Trowbridge
Case No.: IK–91–07–0175, IK–91–06–0032 thru 0034
County: Kent
Sentence: Life Imprisonment
Decision on Appeal: No. 234, 1995, 1996 WL 145788, Veasey, C.J. (Mar. 4, 1996) (ORDER)

Case Name: John E. Watson
Case No.: IN–91–09–0020 thru 0025
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No direct appeal taken

Case Name: Dwayne Weeks
Case No.: 92–01–0167
County: New Castle
Sentence: Death
Decision on Appeal: 653 A.2d 266 (1995)

Case Name: Roy R. Williamson
Case No.: S93–05–0249 thru 0255 and S93–05–1249 and 2249
County: Sussex
Sentence: Life Imprisonment
Decision on Appeal: 669 A.2d 95 (1995)

Case Name: Jermaine M. Wright
Case No.: IN91–04–0147 thru 1953
County: New Castle
Sentence: Death
Decision on Appeal: 671 A.2d 1353 (1996)

Case Name: Craig A. Zebroski
Case No.: IN96–09–1816 thru 1822
County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending