Joseph **CHAMBERS**, Defendant Below, Appellant,

v.

**STATE of Delaware**, Plaintiff Below, Appellee.

No. 282, 2006.

Supreme Court of Delaware.

Submitted: Feb. 21, 2007.
Decided: May 21, 2007.

---

Joseph M. Bernstein, Esquire (argued) and Peter W. Veith, Esquire, Wilmington, Delaware, for appellant.

Kevin M. Carroll, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before HOLLAND, BERGER and RIDGELY, Justices.

HOLLAND, Justice.

The defendant-appellant, Joseph L. Chambers ("Chambers"), was indicted on charges of Capital Murder in the First Degree, Possession of a Firearm During the Commission of a Felony, and Possession of a Firearm by a Person Prohibited. A jury trial was held in the Superior Court. Chambers was convicted on all charges.

Following a penalty hearing, the jury unanimously found the existence of one statutory aggravating circumstance and voted seven to five that the aggravating circumstances outweighed the mitigating circumstances. Chambers was sentenced on June 2, 2006. The trial judge declined to impose a death sentence. Chambers was sentenced to life imprisonment, without the possibility of probation or parole, on the Capital Murder in the First Degree conviction. He was sentenced to an additional fifteen years on the weapons convictions.

Chambers raises two arguments in this direct appeal. First, he contends the Superior Court abused its discretion in denying a defense request for a mistrial, after the trial judge allowed the chief investigating officer to speak with a witness for the

State, during a recess and before the witness had concluded his direct testimony. Second, Chambers submits the Superior Court committed legal error when it refused to give a jury instruction concerning the testimony of accomplices or participants.[1]

We have concluded that both of Chambers' arguments are without merit. Therefore, the judgments of the Superior Court must be affirmed.

### Facts

On April 27, 2003, Gregory Graves, a resident of Simonds Gardens in New Castle, was shot multiple times. His body was found several hours later by William Butler. Butler discovered Graves' body in "the alley between Rosegate and Simonds [Gardens]," and called the police and emergency services through 911.

Butler told police investigators that both he and his wife had been sleeping when they heard gunshots in the early morning hours of April 27, 2003. They ignored them, however, and went back to sleep. During the course of the police investigation, officers spoke with another witness, Benita Evans. Evans told the police that she witnessed an argument between Chambers and Graves. Evans knew Graves and described him as a good friend, someone she could go to if she needed anything, including money or drugs. Evans also recognized Chambers from the neighborhood.

On the night Graves was shot, Evans had been "partying" with drugs and alcohol. She was on her way to a local liquor store when she saw Chambers and Graves arguing. Evans was approximately fifteen feet away. Although Graves and Chambers were not loud, she could tell they were arguing "[b]ecause of their hands, language [and] body movement." Both Chamber and Graves were gone by the time Evans left the liquor store.

After returning to her house, Evans heard Graves' voice. She looked out of a window and saw Graves in the common area outside her building. She remembers this being at approximately 3:00 a.m. Evans went outside and asked if he could get her some cocaine. He said no and indicated that he was waiting for someone. Evans then saw Graves walk towards "[t]he alley [ ] leading to the park." A few minutes later, Evans saw Chambers follow Graves into that same alley.

Officers also learned that Quinton Davis had been out during the general time of the shooting. Davis was a resident of 117 Rose Avenue in the Rosegate neighborhood in New Castle. Investigators spoke with Davis, who told several different stories about the night that Graves was shot. Initially, Davis told investigators that he was at a motel the night of the shooting. He later changed his story and told investigators that he was with Chambers, whom he knew as "Bookie," and Daniel Haye the night Graves was shot.

According to Davis, on April 27, 2003, at around 3:00 a.m., he was sitting with Chambers and Haye, in Haye's car, near Chambers' residence. Chambers left the car and walked past a few of the houses on the street. He then returned to the car and told Davis and Haye that he had something to do in one of the houses. Chambers instructed Davis and Haye to meet him in Simonds Gardens, by "the path." Davis did not know what Chambers had to do in the house. Before driving to Simonds Gardens, Davis got into the front passenger seat of Haye's car. The two then drove to wait for Chambers.

Several minutes later, Chambers met them at the car. He was "walking fast" and "breathing kind of heavy." Chambers

---

1. *Cabrera v. State*, 747 A.2d 543, 544–45 (Del. 2000).

got into the back seat of Haye's car. He told Davis and Haye and that they all needed to get out of the area because he had just shot Graves.

Haye drove to Philadelphia. On the way up to Philadelphia, Chambers rolled the rear window down and back up once. Haye told investigators that he "heard something thrown out of the window" and specifically indicated that a "gun was tossed out of the car in [Chambers'] black hooded sweatshirt along I95 near Philadelphia."

### *Motion for Mistrial Properly Denied*

■ Chambers appeals the Superior Court's denial of his motion for a mistrial. Chambers asserts that it was reversible error for the chief investigating officer, Detective Armstrong, to speak with Quinton Davis during a brief recess in Davis' direct examination.[2] Chambers contends that the sole purpose of the recess was to give the State time to "rehabilitate" Davis' direct testimony.

The trial court judge rejected Chambers' same argument and denied his motion for a mistrial, holding:

> Essentially, the defense is asking me to craft a new rule of procedure that would prohibit communications between an attorney and anybody who's a witness while that witness is on direct examination. That plainly is not the rule that was stated in *Webb v. State*. There's some discussion of how counsel and wit-

nesses interact, but it's basically descriptive and not a matter of a ruling.

> For example, our Supreme court quotes the United States Supreme Court as follows: "It is a common practice for a judge to instruct a witness not to discuss his or testimony with third parties until the trial is completed." That's plainly at variance with the practice in this state. The rule in this state applies only to cross-examination. And I don't know of a rule that would prohibit the Court from allowing consultation during cross-examination for proper purposes.

> That being the case, I allowed the consultation during trial for what it seemed to me was a proper purpose. And as a consequence, the motion for mistrial is denied.

The State asserts that the prosecutor's request for a recess was not aimed at "rehabilitating" Davis' testimony. In support of this contention, the State points to the fact that the prosecutor did not initiate contact with the witness. The record supports the State's position. It was the witness who requested to speak with Detective Armstrong.

Detective Armstrong spoke with Davis at a brief recess during Davis' direct examination. According to Detective Armstrong, his conversation with Davis was not aimed at "controlling or putting a better face on testimonial damage caused by Davis' testimony." Instead, the substance of the conversation, as recounted by De-

---

2. The trial judge granted the State's request to allow Detective Armstrong to speak with Davis:

> The Court: [Defense counsel] hasn't started cross-examination so you're still free to confer with [Davis].
>
> * * *
>
> [Defense Counsel]: I just have one comment about [the prosecutor] talking to a witness after that witness has taken the stand and before that witness is done testifying.

> The Court: I know it's a long-standing rule that an attorney may not confer with a witness who's on cross-examination. But I know of no rule that prevents—
> [Defense Counsel]: I don't think—
>
> * * *
>
> The Court: ... Can you advise me of any rule that would prevent an attorney from conferring with a witness during direct examination?
> [Defense Counsel]: Off the top of my head, no.

tective Armstrong, concerned the safety of Davis and his family.[3] The State notes that there is support in the record concerning the validity of the perceived threat to Davis' safety. On March 18, 2005, the trial judge called counsel to sidebar and explained the presence of extra security within the courtroom. The basis for the increased security was due to information communicated to the Department of Justice that Davis "was a dead man walking."

In *United States v. Calderin–Rodriguez*,[4] the Eighth Circuit addressed the argument that "the district court erred in refusing to strike the testimony of [a] witness ... because [he] discussed his testimony with the prosecutor and another witness during the evening recess midway through his direct testimony."[5] In *Calderin–Rodriguez*, a witness corrected testimony given the day prior. On cross-examination, defense counsel questioned the witness about the correction and the wit-

ness admitted that "[w]ith [the prosecutor's] help I realized what I said was wrong."[6] The Eighth Circuit found no error in the trial judge's denial of the codefendants' motion to strike the witness' testimony:[7]

> ... the meeting between [the witness] and the prosecutor violated neither Federal Rule of Evidence 615 nor the sequestration order in this case. Rule 615 ... does not by its terms forbid an attorney from conferring with witnesses during trial.... Nor is it inherently unethical for a lawyer to speak to a witness once the witness has begun to testify.... Assuredly, the district court, in exercise of its discretion in regulating the conduct of the trial, may impose restriction on an attorney's contact with witnesses during trial, not only to prevent unethical coaching, but also simply to preserve the status quo during breaks in testimony.[8]

---

3. After the brief recess, Detective Armstrong informed the court the nature of Davis' concerns about testifying:

> Sir, I mean we all know, when this occurred, Quinton was 17. He's not 19. He still frequents the Rosegate area, okay.
> During the time period leading up to the trial, he's been approached numerous times, nothing—no overt threats, just, you know, question him, what he's going to testify to. I'm familiar with the Chambers family, and some of the brothers. And he feels intimidated. He feels intimidated with them two in the back row, you know, according to him, staring him down. He does not feel comfortable at this point to sit there and tell the truth, basically.

And that's basically what he told me. He wants to sit down, he wants to tell the truth. Okay. But he's dealing with—and I notice, when he testified, he continuously looked to the back row, you know, for whatever reason. But I was watching his eyesight when [the prosecutor] was interviewing him, and it was continuously directed on the other side. So, there's something going on there that makes him feel uncomfortable.

4. *United States v. Calderin–Rodriguez*, 244 F.3d 977, 984 (8th Cir.2001).

5. *Id.*

6. *Id.*

7. The codefendants in *Calderin–Rodriguez* claimed a violation of their Confrontation Clause rights. Codefendants argued that their cross-examination was less effective because of the conference between the witness, the prosecutor, and another testifying officer. *Id.* at 984. The court rejected that argument, finding "no legal support" for such an argument. *Id.*

8. *Id.* at 984–85 (*citing United States v. Kindle*, 925 F.2d 272, 276 (8th Cir.1991) (Rule 615 does not require court to forbid contact between DEA case agent and witness during trial); *United States v. De Jongh*, 937 F.2d 1, 3 (1st Cir.1991); 29 Charles Alan Wright and Victor James Gold, *Federal Practice and Procedure* § 6243, at 64 (1997) ("During the course of a trial, an attorney customarily consults out-of-court with his client and other witnesses."); *Perry v. Leeke*, 488 U.S. 272,

The Eighth Circuit ruled further that, even if an improper conference is assumed, the defendants failed to show prejudice because, "even without the conference, the government would likely have been able to help [the witness] correct his earlier testimony by showing [him] the reports in court as prior inconsistent statements or to refresh his recollections." [9]

Like its federal counterpart that was addressed in *Calderin–Rodriguez*, Delaware Rule of Evidence 615 vests great discretion in the trial judge in ordering the sequestration of witnesses.[10] While there was a sequestration order in effect at Chambers' trial, that order was not violated by the State. Before Detective Armstrong spoke with Davis, the prosecutor informed the trial judge that Davis had requested to speak with Detective Armstrong. The prosecutor then requested the trial judge's permission to allow Detective Armstrong to speak with Davis. The trial judge granted the prosecutor's request. Accordingly, there is no support for Chambers' claim that the trial judge's sequestration order was violated.

■ This Court reviews a trial court's denial of a motion for a mistrial for abuse of discretion.[11] A mistrial is appropriate "only when there is 'manifest necessity' or the 'ends of public justice would otherwise be defeated.'"[12] Chambers acknowledges that the substance of Davis' "revised" testimony following the recess would have been admissible pursuant to section 3507 of title 11.[13] Accordingly, Chambers can-

not show prejudice from Davis' conversation with Detective Armstrong.[14]

We conclude that the Superior Court properly exercised its discretion in allowing Detective Armstrong to speak with Davis. Moreover, the record reflects no prejudice resulted from their conversation. Accordingly, we hold there was no abuse of the trial judge's discretion in denying Chambers' motion for a mistrial.

### *Requested Jury Instruction*

■ Chambers' second claim on appeal challenges the Superior Court's denial of his request that the jury be instructed to view the testimony of Davis and Haye with caution because both were "admitted participants" or accomplices in the murder of Graves. The trial judge rejected defense counsel's argument that Davis and Haye were either admitted participants or accomplices:

> There is no evidence here that either Davis or Haye were, in fact, accomplices or their participation in the events of the 27th would make them accomplices. They aren't charged in that fashion and, based on what they testified to, that's the only information we have, what they did. There wouldn't be a basis to find them as accomplices. That's the basis I'm denying it.

> \* \* \*

> At the same time, the Court will give the general credibility question that allows counsel to argue that they are biased in some fashion, they had an interest in

281–84, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) (quotation omitted)).

**9.** *United States v. Calderin–Rodriguez*, 244 F.3d at 985.

**10.** *See, e.g., Taylor v. State*, 849 A.2d 405, 408 (Del.2004).

**11.** *Taylor v. State*, 827 A.2d 24, 27 (Del.2003).

**12.** *See, e.g., Pena v. State*, 856 A.2d 548, 552 (Del.2004) (citations omitted).

**13.** The record reflects that when the prosecutor realized he might have to introduce Davis' prior voluntary statement under Title 11, section 3507 of the Delaware Code, he requested a recess to prepare for that eventuality.

**14.** *See United States v. Calderin–Rodriguez*, 244 F.3d at 984–85 (citations omitted).

saying what they said, and basically attacking their credibility on the basis that they were participants in the events and were trying to protect their own hides.

■ The Superior Court is given wide discretion in framing jury instructions.[15] Accordingly, this Court's review of such instructions is limited to determining whether the instruction "correctly states the law and is not so confusing or inaccurate as to undermine the jury's ability to reach a verdict."[16] The record reflects that the Superior Court did not abuse its discretion when it denied the jury instruction requested by Chambers.

■ There must be a rational evidentiary basis before a jury may be instructed on an issue of accomplice or co-conspirator credibility.[17] Delaware law defines an accomplice as a person who "[i]ntending to promote or facilitate the commission of the offense ... solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it; or [a]ids, counsels or agrees or attempts to aid the other person in planning or committing it."[18] There is no basis in the record to conclude that either Davis or Haye were "admitted participants" or accomplices in the murder of Graves. To the contrary,

the record reflects there was no indication that either Davis or Haye knew of Chambers' plan. It was not until after Chambers shot Graves that either of them discovered what had happened.

At trial, Chambers also argued alternatively that the "immunity agreement" between Haye and the prosecutor served as a basis for instructing the jury that both Haye and Davis were Chambers' accomplices in the murder of Graves and to weigh their credibility with "greater caution." The "immunity agreement" stated:

> Daniel Haye agrees to give a truthful, accurate and detailed statement regarding his activities on April 26th, and April 27th 2003. This statement is to include any knowledge of meetings and/or ongoing problems with Joseph Chambers and Gregory Graves and the disposal of any evidence. .
>
> In turn the State of Delaware through [prosecutor], will not prosecute Daniel Haye as an accomplice for the death of Gregory Graves.

Other jurisdictions have held that such an immunity agreement does not provide a basis for concluding that a witness was either an admitted participant or accomplice in shooting of Graves.[19] We agree

---

15. *See., e.g., Cabrera v. State*, 747 A.2d 543 (Del.2000).

16. *Id.*

17. *See, e.g., Guy v. State*, 913 A.2d 558, 563 (Del.2006) (citing *Ayers v. State*, 844 A.2d 304, 309 (Del.2004); *Caldwell v. Commonwealth*, 351 S.W.2d 867, 869 (Ky.App.1961)).

18. Del.Code Ann. tit. 11, § 271(2). *See also Hassan–El v. State*, 911 A.2d 385 (Del.2006).

19. *See State v. Swanson*, 707 N.W.2d 645, 653 (Minn.2006) (general credibility instruction was appropriate where witness testified pursuant to an immunity agreement); *Hopewell v. State*, 122 Md.App. 207, 712 A.2d 88, 93 (1998); *Pilcher v. State*, 303 Ark. 335, 796 S.W.2d 845, 848 (1990) ("Mere presence at

the scene of the crime or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter of law. *Nor does a grant of immunity alone cause a witness to be an accomplice as a matter of law.*") (citations omitted) (emphasis added); *People v. Stankewitz*, 51 Cal.3d 72, 270 Cal. Rptr. 817, 793 P.2d 23, 35 (1990) ("the fact that a witness has been charged or held to answer for the same crimes as the defendant and then has been granted immunity does not necessarily establish that he or she is an accomplice."); *People v. Stafford*, 57 A.D.2d 965, 395 N.Y.S.2d 69, 70 (1977) ("Only where it is uncontroverted that a witness was an accomplice.") (citation omitted); *People v. Basch*, 36 N.Y.2d 154, 365 N.Y.S.2d 836, 325 N.E.2d 156, 158 (1975). *See also Coleman v. State*, 2000 WL 1840511 *2, 2000 Del. LEXIS 490 *5 (Del. Dec. 4, 2000).

with the rationale of those decisions. Thus, we hold Haye's "immunity agreement" did not entitle Chambers to an instruction warning the jury to weigh Haye's and Davis' testimony with "greater caution." [20] Accordingly, there was no error in the trial judge's denial of Chambers' motion to have the jury instructed to assess the credibility of the testimony by Davis and Haye on the basis that they were Chambers' accomplices in the shooting of Graves.

### Conclusion

The judgments of the Superior Court are affirmed.

**20.** *See State v. Swanson,* 707 N.W.2d at 653; *Pilcher v. State,* 796 S.W.2d at 848. *See also* *Raynor v. State,* 343 Ark. 575, 36 S.W.3d 315, 316–17 (2001) (*citing Pilcher v. State* ).