# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ERIC C. LLOYD, | § | |
| | § | No. 460, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1710006739 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 6, 2021
Decided: March 26, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting this Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware: **AFFIRMED**.

Megan J. Davies, Esquire (*argued*), Haddonfield, New Jersey; Jan A. T. van Amerongen, Jr., Esquire, Office of Conflicts Counsel, Wilmington, Delaware, *for Defendant Below, Appellant Eric C. Lloyd.*

Sean P. Lugg, Esquire (*argued*), Delaware Department of Justice, Wilmington, Delaware, *for Plaintiff Below, Appellee State of Delaware.*

**SEITZ**, Chief Justice:

A Superior Court jury convicted Eric Lloyd of six felonies stemming from his involvement in a Wilmington drug dealing enterprise. The Superior Court sentenced Lloyd to an aggregate of thirty years of incarceration without the possibility of early release. On appeal, Lloyd challenges his convictions and sentence. First, Lloyd contends that the trial court erred when it denied his motion to sever his case from that of co-defendant Dwayne White. Second, Lloyd argues that the trial court erred when it denied his motion for a mistrial after an eyewitness to a shooting misidentified Lloyd as the gunman. In Lloyd's third and fourth claims of error, he argues that the trial court should not have admitted gun evidence seized from a co-defendant's apartment and rap music videos created by other enterprise members. Fifth, Lloyd argues that the trial court erred by allowing testimony from Lloyd's former attorney's secretary about a drug transaction. And finally, Lloyd contends that the trial court violated his rights under the Eighth Amendment by imposing consecutive sentences, resulting in thirty years of incarceration, without the option for early release. For the reasons discussed below, we find Lloyd's claims are without merit and affirm the judgment of the Superior Court.

2

I.

This Court has already affirmed the convictions of Lloyd's co-defendant, Dwayne White, who was tried with Lloyd.[1] We incorporate the factual background in that thorough opinion and focus on the facts pertinent to Lloyd's conviction and his arguments on appeal.

A.

According to the record before us, Lloyd was the leader of a sprawling drug dealing enterprise in Wilmington.[2] Beginning in 2015, enterprise members sold large amounts of cocaine and heroin. Lloyd enlisted members to distribute cocaine on a consignment basis.[3] According to William Wisher, an admitted enterprise member, Lloyd would provide him with cocaine at an agreed upon price.[4] Wisher would then "cook" the powder cocaine with baking soda to turn it into crack cocaine.[5] After selling the crack cocaine, Wisher would keep as profit the amount above the agreed upon price.[6] Wisher and Lloyd would communicate using Facetime to avoid law enforcement surveillance.[7] Dante Sykes, another admitted

---

[1] *White v. State*, 243 A.3d 381 (Del. 2020). The defendants used nicknames at times—Lloyd ("Butter," "Butterico," or "Bub"), White ("BD" or "Boop"), and Anderson ("Frog").
[2] App. to Opening Br. at A1133 (Testimony of William Wisher) (describing that Lloyd ran the show, "the whole giddup"); *Id.* at A1234 (Testimony of Dante Sykes) (stating that Lloyd was at the top of the Wilmington drug trade for cocaine).
[3] *Id.* at 1136 (Testimony of William Wisher).
[4] *Id.*
[5] *Id.* at A1137-38.
[6] *Id.* at A1138-39.
[7] *Id.* at A1145.

3

enterprise member, confirmed the same consignment arrangement. Sykes described one transaction when Lloyd delivered a brick of cocaine by putting it in the trunk of his car while Sykes was meeting with his lawyer in Wilmington.[8] The same lawyer, Joseph Benson, represented other members of the enterprise, including Lloyd.

Lloyd concealed illegal drug sale proceeds through the purchase of investment properties, gambling, and sports betting.[9] Lloyd and White created LLCs to purchase real estate, only to quickly transfer the title to a friend or family member at no cost.[10] In one transaction, a property owned by an enterprise member with an assessed value of $52,000 was transferred to White's wife, Nyeesha White, for free. Nyeesha White then placed the property in a trust for fifteen months and transferred the property, again for free, to NCTZA, LLC. The address listed for NCTZA, LLC was the address Lloyd listed as his primary residence.[11] Sykes also described how Lloyd instructed him to use a first-time homeowner program to purchase real estate so he could conceal drug proceeds.[12]

---

[8] *Id.* at A1239 (Testimony of Dante Sykes).

[9] *Id.* at A835-36 (Testimony of Tyrone Roane) ("If I got $50,000 in drug money on me, I can go to casino [sic], and get $1,000 worth of chips and gamble that up so if I lose, I can just flop it out . . . so basically what I'm doing is I'm turning my dirty money into clean money."); A1240 (Testimony of Dante Sykes) (explaining how enterprise members would gamble as "an easy way to wash the money out").

[10] *Id.* at A1369 (Testimony of Michelle Hoffman).

[11] *Id.* at A1372.

[12] *Id.* at A1241 (Testimony of Dante Sykes) (recounting how Lloyd showed Sykes how to use the Interfaith Housing program to "get into the properties, too, . . . you know, having some homes and stuff knowing this drug thing don't last forever").

When Lloyd returned to federal custody in 2017 for a probation violation, he transferred control of the enterprise to White.[13] White expanded the enterprise into heroin sales. Lloyd continued to communicate with members of the enterprise while in prison.[14] At times Lloyd would discuss enterprise business and the challenges of running a large-scale operation.[15] He also continued to manage his investments from prison.

Some enterprise members were associated with smaller groups within the enterprise. White and three other members—Teres Tinnin, Michael Pritchett, and White's brother, Rasheed White—belonged to a group called "The Four Horsemen."[16] Tinnin and Pritchett were also members of the "Big Screen Boys," a group of friends who had an ongoing feud with one of their former associates, Markevis Stanford.[17] The Big Screen Boys included Ryan Bacon, Maurice Cooper, Dion Oliver, Dante Sykes, Tinnin, and Pritchett.[18]

---

[13] *Id.* at A1235 (Testimony of Dante Sykes) ("Bub [Lloyd] had went to jail, so, you know, basically saying he's leaving it with BD [White], leaving, like, the plug with BD [White], so I had to get with BD [White] to get work.").

[14] *Id.* at A1354 (Testimony of Det. Barnes) (describing how Lloyd sent "close to 10,000 emails" while he was incarcerated).

[15] *Id.* at A1362-63 (Testimony of Det. Barnes) (reading an email where Lloyd lamented dealing with "these young boys and these mess ups," and why he avoids street-level dealing).

[16] *Id.* at A175-76 (State's Opening Statement); *Id.* at A464 (Testimony of Det. Barnes) (confirming the Four Horsemen were "the most high level drug dealers in the city of Wilmington").

[17] *Id.* at A843 (Testimony of Tyrone Roane). Stanford is also known as "Young Money." *Id.* at A842.

[18] *Id.* at A842-44 (listing members of the Big Screen Boys); *Id.* at A1256 (Testimony of Dante Sykes).

Believing Stanford was a "snitch," the feud escalated when the Big Screen Boys published a video of two members having sex with Stanford's girlfriend.[19] This led to a series of retaliatory shootings, assaults, and robberies between Stanford and members of the enterprise. The violent activity drew attention from police, which was bad for the enterprise's drug business.[20] White determined Stanford "had to go," and White placed a "bounty" on Stanford's life.[21]

On June 6, 2017, Oliver and Pritchett targeted Stanford in two shootings. Stanford avoided being hit in both incidents. During the second shooting, he shielded himself behind a vehicle stopped at a stop sign.[22] Gunfire meant for Stanford shattered the vehicle's windows and struck a six-year-old passenger, Jashown Banner, causing paralysis and brain damage from his wounds.[23]

After police arrested Pritchett for Banner's shooting, White offered $20,000 to members of Banner's family in exchange for a sworn statement that Pritchett was not involved in the shooting.[24] While investigating Banner's shooting, police

---

[19] *Id.* at A844 (Testimony of Tyrone Roane) ("Big screening means basically when you got a group of individuals, that take a female, have sex with her and record it and spread it through social media, basically on a big screen.").

[20] *Id.* at A850.

[21] *Id.* at A847-50. Roane testified that "the remedy was basically like Young Money [Stanford] had to go, meaning that, . . . somebody would do something to him, so Dwayne White at one particular time, . . . [said] they are going to do something to Young Money [Stanford], a bounty." *Id.* at A848.

[22] *Id.* at A340 (Testimony of Shaylynn Banner).

[23] *Id.* at A342.

[24] *Id.* at A243 (Testimony of Joshua Potts), A347-48 (Testimony of Shaylynn Banner), A355-56 (Testimony of Deborah Banner).

obtained a warrant for a wiretap on White's phone. The wiretap revealed links between White and other individuals who had previously been arrested for drug offenses, as well as connections between these individuals and the larger drug enterprise.

B.

In October 2017, a New Castle County grand jury returned a 36-count indictment against Lloyd and thirty-three other defendants. A series of superseding indictments modified the charges. Lloyd and White were charged in the indictment's lead count, Criminal Racketeering. Lloyd was also charged with six other felony counts: Conspiracy to Commit Criminal Racketeering, Drug Dealing Cocaine, Conspiracy to Deal Cocaine, Money Laundering, Conspiracy to Commit Money Laundering, and Attempting to Evade or Defeat Tax.

Of the three defendants, White was the only defendant charged with the attempted murder of Stanford and Banner's shooting.[25] Lloyd moved to sever his trial from White's trial. Lloyd argued that the Jashown Banner shooting was a separate and distinct event that fell outside of enterprise activity. The court denied the motion. Also, before trial, Lloyd learned that White planned to admit guilt to the Drug Dealing, Conspiracy to Commit Drug Dealing, and Criminal Racketeering charges against him, but that White intended to deny involvement in the charges

---

[25] *Id.* at B261-62.

related to the shooting. Lloyd renewed his motion to sever, this time arguing that White's defenses and Lloyd's defenses were mutually antagonistic. Lloyd also asked the court to reconsider his prior claim that the shooting was beyond the scope of enterprise activity. The court denied the motion.

In addition to witnesses who testified about Lloyd's involvement in the enterprise, the State called three members of Banner's family at trial—Banner's father, Joshua Potts; his mother, Shaylynn Banner; and his grandmother; Deborah Banner. Each served as a witness for the shooting and the bribery attempts. White approached Potts in person and offered him $20,000 in exchange for an affidavit exonerating Pritchett.[26] Next, White sent text messages to Shaylynn Banner and included photos of Pritchett and himself, so she knew who to exculpate.[27] Shaylynn turned the texts and photos over to police. Finally, White approached Deborah Banner in person and made the same $20,000 offer, which she also rejected.[28] The members of the Banner family that White approached each testified that White

---

[26] *Id.* A243-44 (Testimony of Joshua Potts) ("[Lloyd] asked me if . . . we would take a bag of $20,000 and go and say that his man, whoever his man is, wasn't involved in the shooting.")

[27] *Id.* at A345-47 (Testimony of Shaylynn Banner) (describing how she received a text message with a photo of Lloyd and a photo of Pritchett, and that Lloyd asked her to say Pritchett was not involved in the shooting).

[28] *Id.* at A355 (Testimony of Deborah Banner) ("I was offered bribe money to testify that the boy that was driving the truck wasn't him . . . it was a $20,000 offer. $10,000 for me and $10,000 for my daughter Shaylynn.").

identified himself only as "Boop" and they did not know who White was prior to the bribe and never saw him again after.[29]

White admitted that he attempted to bribe the Banner family. During Potts' testimony, the State asked him to identify the person who attempted to bribe him. Pointing to Lloyd, Potts identified the person in "[b]lue jeans over there" as Boop.[30] When the State asked Potts to clarify, Potts again identified Lloyd as Boop.[31] After the misidentification, Lloyd moved for a mistrial. The court denied the request. The State called witnesses to make clear that White solicited the bribe.[32] Counsel also agreed to a stipulation read to the jury correcting the misidentification.[33]

On June 14, 2019, a jury convicted Lloyd of Criminal Racketeering, Conspiracy to Commit Criminal Racketeering, Conspiracy to Deal Cocaine, Money Laundering, Conspiracy to Commit Money Laundering, and Attempting to Evade or Defeat Tax.[34] Lloyd was found not guilty of Drug Dealing Cocaine. On October 17, 2019, the Superior Court sentenced Lloyd to an aggregate thirty years of incarceration, followed by a term of probation.[35] This is Lloyd's direct appeal.

---

[29] *Id.* at A245 (Testimony of Joshua Potts) ("I never met [Boop] – I didn't know him at all."); A345 (Testimony of Shaylynn Banner) (explaining that she did not know who Boop was until he contacted her with the bribe); A356 (Testimony of Deborah Banner) (same).
[30] *Id.* at A243.
[31] *Id.* Shaylynn Banner and Deborah Banner were not asked to make an identification in court.
[32] *Id.* A281-82 (Testimony of Det. Devon Jones).
[33] *Id.* at A1276.
[34] *Id.* at A15.
[35] *Id.* at A1506-07, A1523-28 (Sentence Order).

II.

A.

First, Lloyd challenges the Superior Court's denial of two motions to sever his trial from that of co-defendant Dwayne White. Under Superior Court Criminal Rule 8(a), a defendant may be indicted for two or more offenses if the offenses are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."[36] Superior Court Criminal Rule 8(b) permits joinder of defendants in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transaction constituting an offense or offenses."[37] Rule 14 allows the Superior Court to grant separate trials "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial."[38] "Ordinarily, defendants indicted jointly should be tried together; but, if justice requires it, the trial court should grant separate trials."[39] The defendant bears the burden of establishing more than "mere hypothetical prejudice."[40]

---

[36] Super. Ct. Crim. R. 8(a).
[37] Super. Ct. Crim. R. 8(b).
[38] Super. Ct. Crim. R. 14.
[39] *Skinner v. State*, 575 A.2d 1108, 1119 (Del. 1990) (citing *Jenkins v. State*, 230 A.2d 262, 272 (Del. 1967)).
[40] *Bates v. State*, 386 A.2d 1139, 1142 (Del. 1978).

10

This Court has held that, when reviewing a motion to sever, the trial court should consider when appropriate "(1) problems involving a co-defendant's extra-judicial statements; (2) an absence of substantial independent competent evidence of the movant's guilt; (3) antagonistic defenses as between the co-defendant and the movant; and (4) difficulty in segregating the State's evidence as between the co-defendant and the movant."[41] On appeal, we review a trial court's decision on a motion to sever for abuse of discretion.[42] The denial of a motion to sever will not be set aside "unless [the] defendant demonstrates a 'reasonable probability' that the joint trial caused 'substantial injustice.'"[43]

i.

The Superior Court denied Lloyd's first motion to sever and reasoned that a charge for "criminal racketeering requires proof of a defendant's agreement with at least one other person to commit two or more felonies to further an enterprise."[44] The court also found that "[e]vidence of a defendant's agreements with others to further an enterprise by illegal means, of a defendant's role in coordinating the felonious conduct, and of co-defendants' alleged felonious conduct in furtherance of

---

[41] *Floudiotis v. State*, 726 A.2d 1196, 1210 (Del. 1999) (citing *Manley v. State*, 709 A.2d 643, 652 (Del. 1998)). *See Jenkins*, 230 A.2d at 273.
[42] *Phillips v. State*, 154 A.3d 1146, 1156 (Del. 2017) (citing *Winer v. State*, 950 A.2d 642, 648 (Del. 2008)).
[43] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Walker v. State*, 790 A.2d 477, 2002 WL 122643, at *1 (Del. Jan. 24, 2002) (TABLE)); Super. Ct. Crim. R. 8(a); Super. Ct. Crim. R. 14.
[44] App. to Opening Br. at A60 (Order Denying Mot. to Sever).

11

that enterprise would all be inextricably intertwined."[45] According to the court, Lloyd was alleged to be at the center of the enterprise and conspired with White and many other individuals in furtherance of the enterprise by committing numerous felony acts.[46] The court concluded that all of Lloyd's and White's actions were alleged "predicate offenses" of criminal racketeering committed in furtherance of the enterprise and were thus inextricably intertwined.[47]

Lloyd agrees that Rule 8(b) provides substantial leeway for the State to join racketeering defendants in a single trial.[48] Lloyd also agrees that defendants charged with participating in the same racketeering enterprise or conspiracy can be tried together, even when different defendants are charged with different acts in the indictment, if the acts charged against each defendant are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with a commonly charged enterprise or conspiracy.[49] Lloyd argues, however, that Banner's shooting and the predicate acts of attempted murder, conspiracy to commit murder, criminal solicitation of murder, and aggravated intimidation "were not acts which had the same or similar purposes, results, participants, victims, or methods of commission,

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] Opening Br. at 15-16.

[49] *Id.* (citing *United States v. Dickens*, 695 F.2d 765, 779 (3d Cir. 1982) ("However peripheral defendants perceive their participation, Congress intended RICO prosecutions to entrammel 'even the smallest fish.'"), *cert. denied*, 460 U.S. 1092 (1983)).

or otherwise were interrelated by distinguishing characteristics."[50]  In other words, these predicates "were not related to the drug dealing activities of the enterprise and Defendant White was not able to commit these offenses solely because of his relationship to the enterprise."[51]  According to Lloyd, the individuals indicted for charges related to the shooting "were all members of a separate and distinct group from the larger enterprise; 'The Big Screen Boys' and/or 'The Four Horsemen.'"[52]

We disagree.  In *H. J. Inc. v. Northwestern Bell Tel. Co.*,[53] the United States Supreme Court held that, when addressing the federal RICO statute that, to prove a pattern of racketeering activity, the government must show that the predicate acts are related to the enterprise and they amount to or pose a threat of continued criminal activity.[54]  We have followed this precedent when interpreting our state racketeering statute.[55]  The first prong – relatedness – exists if the racketeering acts "have the same or similar purposes, results, participants, victims, or other methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."[56]  "[D]ifferent members may perform different roles at different

---

[50] Opening Br. at 17.
[51] *Id.*
[52] *Id.*
[53] 492 U.S. 229 (1989).
[54] *H.J. Inc.*, 492 U.S. at 239.
[55] *See Kendall v. State*, 726 A.2d 1191, 1194 (Del. 1999) (quoting *Stroik v. State*, 671 A.2d 1335, 1342 (Del. 1996) (citing *H.J. Inc.*, 492 U.S. at 239)).
[56] *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e))).

13

times."[57] The second prong – continuity – is present when "the predicate acts themselves involve threats of long-term racketeering activity, or . . . [that] the predicate acts are part of an entity's regular way of doing business."[58]

The attempted murder of Stanford and the shooting of Jashown Banner are predicate acts that meet the relatedness standard. The State presented evidence that the drug dealing enterprise and the shooting involved similar purposes, participants, and were otherwise interrelated to the activities of the drug dealing enterprise. Specifically, testimony from enterprise members showed that Stanford's retaliatory attacks were a threat to enterprise business by bringing unwanted attention of police investigators to the enterprise.[59] By removing Stanford, the enterprise sought to stop the feud and the unwanted attention it brought to the enterprise. The Superior Court did not abuse its discretion in denying Lloyd's first motion to sever.

ii.

Lloyd renewed his motion to sever after White decided he would admit to participating in a drug dealing enterprise. The Superior Court denied the motion. It found that White's admission to drug dealing would not "create such a serious risk"

---

[57] *Boyle v. United States*, 556 U.S. 938, 948 (2009).

[58] *Kendall*, 726 A.2d at 1194 (quoting *United States v. Pelullo*, 964 F.2d 193, 208 (3d Cir. 1992) (citing *H.J. Inc.*, 492 U.S. at 242)).

[59] App. to Opening Br. at A850 (Testimony of Tyrone Roane) (explaining that the shootings were bad for enterprise business "[b]ecause the more shooting the more the police were going to be around"); *Id.* at A1245 (Testimony of Dante Sykes) (describing how shootings are "bad for business" because they draw unnecessary attention and "bring the[] police around").

14

that the jury would confuse White's participation in the enterprise with that of Lloyd.[60] The court also instructed the jury that each defendant is charged with a separate offense and should be evaluated independently.[61]

Lloyd argues on appeal that the court erred because his defense was mutually exclusive and irreconcilable with White's concession that the drug dealing enterprise existed. He asserts that White's concession conflicted with Lloyd's defense, which was to deny the existence of any enterprise. As such, according to Lloyd, "the jury could not believe both" and his case should have been severed for antagonistic defenses.[62]

"[T]he presence of hostility between a defendant and his codefendant or 'mere inconsistencies in defenses or trial strategies' do not require a severance."[63] Rather, severance is necessary "when 'the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant[.]'"[64] Mutually exclusive defenses were not present here. As the Superior Court found, "the fact that the defendants [had] conflicting versions of what

[60] *Id.* at A93-94 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[W]hen defendants properly have been joined under Rule 8(b), a district court should grant severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.")).

[61] *Id.* at A94.

[62] Opening Br. at 20.

[63] *Phillips*, 154 A.3d at 1157 (alteration in original) (internal quotation marks omitted) (quoting *Outten v. State*, 650 A.2d 1291, 1298 (Del. 1994)).

[64] *Manley*, 709 A.2d at 652 (internal quotation marks omitted) (quoting *Bradley v. State*, 559 A.2d 1234, 1241 (Del. 1989)).

took place or[,] . . . the extent to which they participated in [the enterprise], is a reason for rather than against a joint trial" because it is easier to uncover the truth in these situations if the defendants are tried together.[65] The court pointed out that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials or whenever co-defendants have conflicting defenses."[66] Rather, a court should grant severance only when there is a "serious risk" that the "joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."[67] But, as the court explained, even in the presence of a serious risk of prejudice, severance is unnecessary if the prejudice can be cured with a proper jury instruction.[68]

Although White and Lloyd took differing positions with respect to the existence of the enterprise and their participation in the enterprise, we agree with the Superior Court's reasoning that White's trial strategy to admit guilt to the drug dealing and racketeering charges did not "create such a serious risk" and was not "so antagonistic" that the jury could not be properly instructed as to avoid substantial

---

[65] App. to Opening Br. at A93.
[66] *Id.* (citing *Zafiro*, 506 U.S. at 540); *see also Taylor v. State*, 76 A.3d 791, 801 (Del. 2013) ("[A] defendant is not entitled to a separate trial simply because he might then stand a better chance of being acquitted.").
[67] App. to Opening Br. at A93.
[68] *Id.* at A93-94.

prejudice to Lloyd. The jury could have concluded that White was part of an enterprise that did not include Lloyd.

Lloyd also argues that he was prejudiced by the State's references to the shooting of Jashown Banner. But the court also gave the following instruction to the jury with respect to assessing evidence against each defendant:

> The defendants are each charged with separate offenses that are set forth in the indictment. These are each separate and distinct offenses, and you must independently evaluate each offense. The fact that you reach a conclusion with respect to one offense, or with regard to one defendant, does not mean that the same conclusion will apply to any other charged offense or to any other charged defendant. Each charge before you is separate and distinct, and you must evaluate evidence as to one offense independently from evidence of each other offense and render a verdict as to each individually.[69]

"Juries are presumed to follow the court's instructions."[70] Indeed, the jury found Lloyd guilty of all charges, except the drug dealing charge. This suggests that the jury understood the above instruction and assessed each defendant's charges with due care. And, as we discuss next, we reject Lloyd's argument that he suffered prejudice from the misidentification at trial of Lloyd as White and his participation in the bribery scheme.

---

[69] *Id.* at A1457.

[70] *Phillips*, 154 A.3d at 1157.

B.

During Potts' trial testimony, he twice misidentified Lloyd as "Boop."[71] Shaylynn Banner and Deborah Banner were not asked to make an eye-witness identification of the man who attempted to bribe them, although they both testified that the man who contacted them identified himself as "Boop." After Potts' testimony, the State called Detective Devon Jones who clarified that "Dwayne White also goes by the nickname Boop."[72] Detective Jones offered further clarification and stated, about a photograph of White, that White was the person who the Banner family told police had contacted them with a bribe.[73]

Lloyd moved for a mistrial the following day, arguing that the misidentification was prejudicial because it created an inaccurate association between Lloyd and Banner's shooting and the subsequent bribe. The Superior Court denied the motion and concluded that granting a mistrial would be "too draconian a remedy for the problem that occurred[,]"—that being "the misidentification of [Lloyd] by an, obviously, distraught witness who is the father of the child who was shot."[74] The court reasoned that later testimony from Detective Jones "sufficiently

---

[71] App. to Opening Br. at A243 (Testimony of Joshua Potts).
[72] Id. at A282 (Testimony of Det. Devon Jones).
[73] Id. at A281.
[74] Id. at A403.

18

cured the problem."[75] The court added that a stipulation by the State and White as to White's involvement in the bribe, while not necessary, would further mitigate any remaining issues.[76] The State and White stipulated to the jury that:

> The State of Delaware and defendant Dwayne White hereby stipulate to the following: One, one of Dwayne White's nicknames is Boop. Two, that Dwayne White approached Joshua Potts, Shaylynn Banner, and Deborah Banner with an offer of money in exchange for their exoneration of Michael Pritchett in the shooting of Jashown Banner.[77]

The court instructed the jury that, "[w]hen the attorneys on both sides stipulate or agree as to the existence of a fact . . . you must, unless otherwise instructed, accept the stipulation as evidence and regard that fact as proved."[78]

On appeal, Lloyd asks the Court to review the trial judge's denial of his motion for mistrial under the factors set forth in *Pena v. State*[79] for an unsolicited prejudicial response by a witness. According to Lloyd, *Pena* applies because Potts' "answer was not the answer the [State] was expecting or attempting to solicit . . . ."[80] We review the denial of a motion for a mistrial for abuse of discretion.[81]

While we have not held that the *Pena* factors apply to mistaken identity testimony, the parties have used the framework here. In *Pena*, this Court set forth a

---

[75] *Id.*
[76] *Id.* at A403-04.
[77] *Id.* at A1276.
[78] *Id.* at A1458 (Jury Instructions).
[79] 856 A.2d 548, 550-51 (Del. 2004) (citing *Griffith v. State*, 2003 WL 1987915, at *4 (Del. 2003)).
[80] Opening Br. at 25 n.10.
[81] *Chambers v. State*, 930 A.2d 904, 909 (Del. 2007).

19

four-factor test for appellate review of an alleged prejudicial remark by a witness: (1) the nature and frequency of the offending comment; (2) the likelihood of resulting prejudice; (3) the closeness of the case; and (4) the adequacy of the judge's actions to mitigate any potential prejudice.[82] Here, if the *Pena* factors are applied, they do not weigh in favor of a mistrial.

First, the misidentification was not so prejudicial to warrant a mistrial. While Potts did make two misidentifications, he named Boop as the person who approached him. The next person to testify was Detective Jones. During Detective Jones' testimony, the jury was shown a photo of White, and Detective Jones clarified that Boop is Dwayne White. Second, the record contains dozens of references to Boop as the individual who bribed the Banner family, including testimony from Shaylynn Banner and Deborah Banner. Thus, Potts' misidentifications were unlikely to have misled the jury. Third, the record reflects that this was not a close case. The State had a strong case against Lloyd. The State's witnesses testified about Lloyd's central role in the enterprise, the State's experts explained how Lloyd hid drug proceeds through investment properties and gambling, and the State introduced emails from Lloyd to enterprise members while he was in prison about enterprise operations. Finally, the trial judge's response was sufficient to mitigate any prejudice from the misidentification. The court asked the State and White to

---

[82] *Pena*, 856 A.2d at 550-51.

20

stipulate to White's nickname and his involvement in the bribe. Lloyd did not request any changes to the proposed stipulation. The court then instructed the jury that it must accept the stipulation as fact. "A trial judge is in the best position to assess the risk of any prejudice resulting from trial events."[83] And, as we noted above, "juries are presumed to follow the court's instructions."[84] The court's response to the misidentification cured any prejudice from Potts' misidentification.

C.

Lloyd argues next that the Superior Court erred when it admitted statements made by a secretary who worked for Lloyd's former attorney, Joseph Benson. At trial, Sykes, one of the enterprise members, testified that he arranged a drug exchange in the parking lot of Benson's office. Lloyd planned to drop off a "brick"—or a kilo (2.2 pounds)— of cocaine in Sykes' car while Sykes was meeting at Benson's office.[85] Sykes "guess[ed]" that Benson's secretary must have observed Lloyd putting the drugs in Sykes' car because she approached Sykes afterward and said, "Don't do that again . . . I'm going to talk to Eric [Lloyd], but don't do that again."[86] Over Lloyd's objection, the Superior Court allowed the testimony under the present sense impression exception to the hearsay rule.[87] On appeal, Lloyd

---

[83] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008).
[84] *Phillips*, 154 A.3d at 1157.
[85] App. to Opening Br. at A1240 (Testimony of Dante Sykes).
[86] *Id.*
[87] *Id.*

argues that the secretary's statement did not qualify as a present sense impression.[88]

We review a trial court's decision to admit or deny evidence for abuse of discretion.[89]

"Hearsay statements are generally inadmissible."[90] But present sense impression is a "well recognized exception[] to the general evidentiary rule against hearsay."[91] D.R.E. 803(1) defines a present sense impression, which is not excluded by the rule against hearsay, as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."

Although it is debatable how the secretary's statement can be characterized as a description or an explanation of an event or condition and it is unclear from the statement itself what the secretary perceived while or immediately before she uttered it, any error in admitting the statement was harmless. The State apparently offered the statement to suggest that the secretary witnessed some sort of illicit transaction in the law firm's parking lot. But Sykes offered first-hand testimony that he and Lloyd had planned the drug delivery to take place in the law firm's parking lot while Sykes was inside. And Sykes further testified that, when he left the office following his encounter with the secretary, he found the "brick" of cocaine under the front seat of his car. Given this testimony, the statement attributed to the secretary, even when

---

[88] Opening Br. at 34.

[89] *Wright v. State*, 25 A.3d 747, 752 (Del. 2011).

[90] *Urquhart v. State*, 133 A.3d 981, 2016 WL 768268, at *2 (Del. Feb. 26, 2016) (citing D.R.E. 802).

[91] *Id.* (citing *Wheeler v. State*, 36 A.3d 310, 314 (Del. 2012)).

accorded its most sinister connotation, was merely cumulative and did not affect Lloyd's substantial rights.[92]

D.

The Superior Court admitted into evidence guns seized from the apartment and storage unit of another co-defendant, Maurice Cooper. The court found that the gun evidence was relevant and went to the State's showing of the existence of an illegal drug dealing enterprise.[93] Lloyd argues on appeal that the gun evidence was highly prejudicial and irrelevant, "as none of the defendants were charged with utilizing guns generally, and certainly not the guns recovered from Cooper's apartment."[94] We review the Superior Court's decision to admit or exclude evidence for abuse of discretion.[95]

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"[96] and is admissible unless otherwise provided by statue or rule.[97] Relevant evidence may be excluded "if its probative value is substantially

---

[92] Super. Ct. Crim. R. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *see also Reynolds v. State*, 424 A.2d 6, 7 (Del. 1980) (finding that the admission of opinion testimony, which "added little, if anything, to the [witness's] factual recitation . . . [and] amounted to little more than surplusage . . . was clearly harmless.")
[93] App. to Opening Br. at A1223.
[94] Opening Br. at 36-37.
[95] *Wright*, 25 A.3d at 752.
[96] D.R.E. 401.
[97] D.R.E. 402.

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[98]

Here, the guns were found in the storage unit of an enterprise member along with a large quantity of heroin.[99] Lloyd was charged as one of the leaders of a drug dealing enterprise. The Superior Court ruled correctly that the firearms and drugs tended to establish the existence of a drug dealing enterprise and its business and operations.

E.

At trial, the State admitted five music videos created by Ryan Bacon. The videos featured combinations of enterprise members, including Bacon, Oliver, Pritchett, Tinnin, as well as Lloyd's co-defendants White and Anderson, among others.[100] The videos' lyrics and imagery referred to drug dealing, gambling, high-end homes, jewelry, and expensive cars. One video, "Coke in My System," contained a reference to "Butterico," which multiple witnesses testified was Lloyd's nickname.[101] Coke in My System also depicted enterprise members apparently cooking crack cocaine.[102] In response to an objection, the State explained that "the videos illustrate predicate acts and associations of members of the enterprise and that

---

[98] D.R.E. 403.
[99] App. to Opening Br. at A1224-25 (Testimony of Special Agent Haney).
[100] *Id*. at A450-52, A455-56 (Testimony of Det. Barnes).
[101] *Id.* at A457.
[102] *Id.* at A473.

24

the videos assist in establishing the existence of the criminal enterprise."[103]  The Superior Court admitted the videos, and found that, because "we're dealing with the racketeering case, [] it's a requirement of the [S]tate to prove predicate offenses and I think this goes to illustrate that."[104]

On appeal, Lloyd contends that the videos should not have been admitted against him because they were related to predicate offenses involving only the shooting and attempted murder, for which only White was charged.  Relying on *Taylor v. State*,[105] Lloyd further contends that the Superior Court failed to determine whether the videos were being admitted for a proper purpose.  We review the Superior Court's ruling on whether to admit or deny evidence for abuse of discretion.[106]

Lloyd was charged with Criminal Racketeering.  As discussed above, the State was required to prove that Lloyd engaged in a "pattern of racketeering," demonstrated by (1) two or more incidents of conduct that constitute racketeering activity, (2) are related to the affairs of the enterprise, (3) and are not so closely related to each other and connected in a point of time and place related that they constitute a single event.[107]  The videos were introduced to demonstrate the existence

---

[103] *Id.* at A421-22.
[104] *Id.* at A423.
[105] 76 A.3d 791 (Del. 2013).
[106] *Wright*, 25 A.3d at 75.
[107] 11 *Del. C.* § 1502(5)(a).

25

of the enterprise and to link the participants to the enterprise through a pattern of racketeering activity.[108] The videos show enterprise members glorifying drug dealing and its financial benefits. The videos supported the existence of an illegal drug dealing enterprise by the enterprise members appearing in the videos. Further, the State's witnesses, including certain members of the enterprise, established a nexus between specific details of the videos and the circumstances of the enterprise and the racketeering activity during the relevant timeframe.

Lloyd's reliance on *Taylor* is misplaced. In *Taylor*, the defendant was charged with gang participation. To prove the defendant was affiliated with the gang, the State sought to introduce lyrics that "generally discuss[ed] drug dealing and violent acts" and "contain[ed] statements that specifically reference[d] animosity between" the two rival gangs at issue in the case.[109] The Superior Court admitted the videos under the co-conspirator exception to the hearsay rule because the song was performed by a co-defendant.[110] The court then conducted an additional analysis under *Getz v. State* and concluded that the video was not being admitted for an

---

[108] App. to Opening Br. at A421-22 (The State argued that "[t]he videos themselves are illustrating predicate acts of other co-defendants associations. In fact, the first element of the most fundamental charge in this entire case is association of fact. The state has to prove that with the people").

[109] *Taylor*, 76 A.3d at 802.

[110] Under D.R.E. 801(d)(2)(E), "a statement is not hearsay if offered against a party and is 'a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court." D.R.E. 801(d)(2)(E).

improper purpose. On appeal, we held that the Superior Court did not abuse its discretion in admitting the videos because the videos "helped establish the fact that the TrapStars are a criminal street gang."[111] We further noted that "the determination of whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice is a matter which falls particularly within the discretion of the trial court, which has the firsthand opportunity to evaluate relevant factors."[112]

Here, the state did not rely on the co-conspirator exception to the hearsay rule for admission of the videos. Instead, the State relied on the videos to prove the existence of a drug dealing enterprise involving the individuals featured in the videos. The *Getz* factors did not need to be reviewed before admitting the videos.

## F.

Lloyd's final claim is that his sentence of thirty years of incarceration without the option of early release violates his constitutional protection against cruel and unusual punishment. "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"[113]

---

[111] *Taylor*, 76 A.3d at 802.

[112] *Id.* (quoting *Williams v. State*, 494, A.2d 1237, 1241 (Del. 1985)).

[113] *Crosby v. State*, 824 A.2d 894, 904 (Del. 2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996-97 (1991) (Kennedy, J. concurring in part and concurring in judgment)).

The jury convicted Lloyd of Criminal Racketeering, Conspiracy to Commit Criminal Racketeering, Conspiracy to Deal Cocaine, Money Laundering, Conspiracy to Commit Money Laundering, and Attempting to Evade or Defeat Tax. Before imposing the sentence, the Superior Court addressed Lloyd directly and explained its sentence as follows:

> I did preside over the trial, so I'm familiar with the facts in the case, and to use [Lloyd's counsel's] words, there are a lot of blurring of facts and responsibility and involvement, but the bottom line is that the State prove[d] there is beyond a reasonable doubt one large sprawling – I'll call it dangerous racketeering enterprise. And I say "dangerous" because so many drugs were involved, and when we speak of victims, who knows who could ever guess how many victims there were of either becoming addicted, of aggravating their addiction, of persons who were addicted committing crimes. It's just a great big tangled kind of web, these drug operations . . . were talking not just about crime, but the business of crime.
>
> ***
>
> You made the choice after serving a 14-year Federal sentence for re-engaging in the drug racketeering business. And as [the State] pointed out, it preceded your going back into prison for a relatively short Violation of Probation stay.
>
> ***
>
> What's most concerning to [the court], . . . is after you served a lengthy prison sentence . . . for a drug charge, you came back, and you made the voluntary decision to reimmerse yourself into the drug world.
>
> ***
>
> Here, a 14-year sentence didn't get that message to you, and if one of the functions of a sentence is to keep the streets of Delaware and

elsewhere safe, it's to put behind bars and into jail people who might be likely to re-offend when they get out.[114]

The judge also observed that Lloyd was "highly, highly involved, if not a kingpin in this."[115]

The court sentenced Lloyd to an aggregate of thirty years of incarceration at Level V to be served in its entirety under 11 *Del. C.* § 4204(k).[116]  On appeal, Lloyd contends that his sentence is grossly disproportionate to the crimes committed and is therefore prohibited by the Eighth Amendment.   According to Lloyd, the State's arguments at trial were unsupported by the evidence presented.  Specifically, Lloyd challenges the State's claims that he was the kingpin "directing the organization through thousands of emails he sent from prison."[117]   Rather, as Lloyd argues, the State introduced only a "handful" of incriminating emails, and the rest of the emails were merely communications between lifelong friends.[118]

In *Crosby v. State*,[119] we examined the Eighth Amendment's proportionality requirement and established a two-part test to determine whether a particular sentence is prohibited:

---

[114] App. to Opening Br. at A1503-06.

[115] *Id.*

[116] *Id.* at A1506-07.  Section 4204(k) provides that the sentencing court may require that a specified Level V sentence "be served without benefit of any form of early release, good time, furlough, work release, supervised custody or any other form of reduction or diminution of sentence."  11 *Del. C.* § 4204(k)(1).

[117] Opening Br. at 42.

[118] *Id.*

[119] 824 A.2d 894 (Del. 2003).

[First,] this Court must undertake a threshold comparison of the crime committed and the sentence imposed. If such a comparison leads to an inference of gross disproportionality, then this Court must compare [the defendant]'s sentence with other similar cases to determine whether the trial court acted out of step with sentencing norms.[120]

Crosby was convicted of forgery and received a life sentence under Delaware's habitual offender statute.[121] We held that when the triggering crime was "a single count of the least serious, non-violent felony," the imposition of a life sentence was "so disproportionate that it must be set aside."[122]

Here, Lloyd's sentence is not prohibited because a comparison of the crimes committed and the sentence imposed does not lead to an inference of gross disproportionality. Lloyd, unlike Crosby, was convicted of six felonies, including Criminal Racketeering, a class B violent felony which carries up to 25 years imprisonment under the SENTAC guidelines.[123] As the Superior Court noted, Lloyd was a three-time felon who, after serving a 14-year sentence in federal prison, opted to reimmerse himself in the illegal drug trade. All told, Lloyd orchestrated an expansive drug enterprise that specialized in concealing large sums of money through sophisticated channels. Given the severity of Lloyd's crimes, a threshold

---

[120] *Id.* at 908 (internal quotation marks omitted) (quoting *Harmelin*, 501 U.S. at 1005).

[121] *Id.* at 902 (finding that "Crosby's life sentence as an habitual offender under section 4214(a) was equivalent to a fixed term of 45 years").

[122] *Id.* at 912-13. The defendant's prior history included several felonies, all of which fell in the lowest classes of felonies—class C and below. *Id.* at 908-09.

[123] *See* SENTAC Benchbook 2020 at 2 (summarizing presumptive and statutory sentences for felonies).

comparison relative to the sentence imposed does not lead to an inference of gross disproportionality.  Thus, we do not need to reach the second prong of *Crosby*.

III.

The judgment of the Superior Court is affirmed.